Vision  - Page 1

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| SAMANTHA SIVA KUMARAN | |
| Other similarly situated Customers 1-100 | |
| Other similarly situated CTA's 1-100 | |
| Nefertiti Risk Capital Management, LLC | Case No: 1:20:CV:_____ |
| , | Judge:_____ |
| *Plaintiff,* | Related Case:  1:20:CV 03668 |
| | |
| -against- | |
| | |
| Vision Financial Markets, LLC | **COMPLAINT** |
| Vision Investment Advisors, Inc | **JURY TRIAL DEMANDED** |
| Vision Brokerage Services, LLC | |
| H Rothman Family Advisors, Inc | |
| Boshnack Family, LLC | |
| High Ridge Holding Corporation, Inc | |
| High Ridge Futures, LLC | |
| Howard Rothman, Robert Boshnack, | |
| John Felag, Julie Villa | |
| Gerard Stephen Lazzara, Lazzara Consulting, Inc | |
| *Defendants* | , |

_____

Pursuant to Federal Rules of Civil Procedure ("FRCP") 3, and incorporating by reference the exhibits under FRCP 10(c),  Plaintiffs Samantha Siva Kumaran ("Kumaran"), Customers 1-100, CTA's 1-100, Nefertiti Risk Capital Management, LLC, allege for its complaint as follows:

## PRELIMINARY STATEMENT

1.   This action involves a fraudulent scheme, perpetuated by all Defendants for over more than five (5) years to defraud and induce commodities futures customers to open accounts in violation of the Commodities Exchange Act, using predicate acts of wire fraud and violations of the Defend Trade Secrets Act, to disseminate customers' confidential trading accounts, and overcharge unauthorized fees, in interstate commerce, without the customers knowledge, consent and permission, in direct unfair competition, to owners, employees and affiliates of the disbarred FCM, Vision Financial Markets, LLC.

2.   There tortious acts were in direct unfair competition in the commodities futures markets and have harmed customers and CTA's (a) to extract an amount estimated to be over $50 million in dollars of unauthorized fees (b) to deplete the performance history of their competitor CTA's, including Kumaran, to diminish their profitability of as much as 12% in return a year, by suppressing performance of their trading account, in unfair market competition, (c) improperly acquired, disseminated and used, the confidential trading records, and risk management strategies of their competitor, CTA's and customers, and then, in direct competition formed a computing CTA called Vision Investment; (d) through the trading of numerous proprietary accounts under the family offices of Rothman, Boshnack and other affiliates named as defendants, used and incorporate the proprietary trading strategies and risk management strategies in direct competition;

(e) materially took actions to harm their competitors CTA's, by the diversion of Assets Under Management "AUM" by having direct acquisition of their trade secrets, diverting capital raise away from their competitors, and improperly acquired access to all their confidential and proprietary trading record

3.   Starting in or around September 2014 and continuing until present date, Defendants engaged in a fraudulent scheme,  together with ADM Investors services, and a network of about 80-100 Vision IB's, and aided by various key insiders at the National Futures Association, Tom Kadlec, and two compliance officers, to  deceive, and  defraud thousands of commodities futures customers and CTA in the commodities futures markets, who innocently opened accounts at ADMIS.

4.  Dozens of customers and CTA"s including Plaintiffs located in New York City, who inadvertently opened accounts at ADMIS during the period September 2014 until present date, fell victim to a fraudulent and behind the scenes scheme, whereby, ADMIS,  in exchange for financial benefits, sold and/or distributed and gave fully disclosed access to multiple of their confidential customers' and CTA's private futures account data, details of the inner workings of their trading positions, as well as their personal private data, _without the customers knowledge, permission and consent_ to Vision's owners, employees, and affiliates.

5.   Further the scheme solicits millions of dollars of unauthorized fees and charges, estimated to total over $10 million dollars a year, in violation of the Commodities Exchange Act (which are expressly not authorized by the customer or CTA) to be deducted in cash from ADMIS accounts to be used to make personal payments to Rothman, Boshnack and Vision affiliates, across interstate lines in Stamford Connecticut, and other financial benefits, which are fraudulently concealed from customers and CTA's prior to account opening;

6.   Further, after ADMIS deceived and betrayed hundreds of its customers and CTA's by secretively giving Vision's owners, employees and affiliates unlawful access to their confidential trading accounts, and trade secrets, and disseminating their confidential and proprietary trading strategies to their competitors in Stamford CT, ADMIS' CEO Tom Kadlec, on the Membership Committee of the NFA, then facilitated the registration of Vision Investment Advisors, LLC, a direct competitor, as a CTA, having unlawfully acquired all ADMIS' CTA's trading data in violation of the Defend Trade Secrets Act numerous regulatory compliance laws,  and violation of the CEA. Without limitation, Defendants in bad faith, materially violated NFA 2-4 9061.

7.   This conduct violates the heart of the Commodities Exchange Act, which is to protect market integrity, and to promote principles of fair and equitable trade, and promote fair market competition, and constitutes fraud and deceptive trade practices.

8.   Additionally, the illegal conduct, has allowed the disbarred Vision's owners, employees and affiliates, ADMIS and its conspirators to amass approximately $50 million and continues to amass illegal unauthorized fees and charges, being passed through to ADMIS accounts to fund Vision's new businesses, destroy fair market competition amongst CTA's, and small businesses.

9.   Since the proprietary information was disseminated to and utilized in Stamford, Connecticut, and other branch offices, their actions violated the Defend Trade Secrets Act provides for a federal, private, civil cause of action for trade-secret misappropriation in which "[a]n owner of a trade secret that is misappropriated may bring a civil action ,, . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. section 1831 et seq.  It also constitutes a predicate act for a RICO violation.

10. As a material part of enacting and covering up the fraud, ADMIS, CEO Tom Kadlec is also an NFA Board Member, curried favor and utilized at least two long standing insider NFA Compliance Officers, who were familiar with the dealings of Vision and had knowingly participated in the fraud to violated NFA Compliance Rules to permit Vision, its officers, employees and affiliates to access customers and CTA's trade secrets, confidential trading records and privacy laws, in exchange for generating millions of dollars of revenue for the NFA.[1]

11. Without someone on the inside of the NFA to condone the rule violations, ADMIS, Vision and the Vision IB's and LCI would not have been able to perpetuate the fraud for over five years, and upon belief,  so far the customers and CTA's never found out.  NFA, with full participation in the conduct, willfully in bad faith, as documented herein, failed to enforce its compliance laws.

### JURISDICTION AND VENUE

12. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

13. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

14. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

15. Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

16. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Southern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred;

---

[1] 20 CV 03668 DKT 1

## PARTIES

17. Vision Financial Markets, LLC is a Limited Liability Company with main offices at 4 High Ridge Park, Suite 100, Stamford, CT 06905 United States. Its membership with the NFA was terminated in or around June 2014, however it remains in operations and its recent filings with the SEC show that it is still active in business.

18. Vision Investment Advisors, LLC is a Limited Liability Company, located 120 Long Ridge Rd, 3 North, Stamford, CT 06902, United States and is a registered Commodities Trading Advisor and is a  direct competitor of Kumaran, NRCM and Plaintiffs CTA's 1-100. It is owned by Howard Rothman, Robert Boshnack and their family offices.

19. John Felag is an individual and resident of Stamford CT. He provides risk management services, and CTA services and is a direct competitor of Kumaran, NRCM and Plaintiffs CTA's 1-100. Upon information belief, John Felag is the risk management and has power of attorney on all Vision owners and affiliates trading accounts listed as Defendants herein.

20. Howard Rothman is an individual and resident of Stamford CT. He is a principal and owns more than 10% of Vision affiliates that acquired and profited from the trade secrets hereunder. He provides risk management services, and CTA services and is a direct competitor of Kumaran, NRCM, and Plaintiffs 1-100.

21. Robert Boshnack is individual and resident of New York City, NY. He is a principal and owns more than 10% of Vision affiliates that acquired and profited from the trade secrets hereunder. He provides risk management services, and CTA services and is a direct competitor of Kumaran, NRCM and Plaintiffs 1-100.

22.  Boshnack Family LLC, is a family office and trading firm located at 631 Long Ridge Rd, Unit 56, Stamford, CT, 06902 that improperly acquired the trade secrets of Plaintiff Kumaran, NRCM, and Plaintiff CTA'1-100 and as listed on NFA Basic, owns more than 10% and has a direct financial interest in Vision Investment Advisors. Boshnack Family LLC maintains proprietary trading accounts in direct competition to Plaintiffs Kumaran, NRCM and CTA's 1-100.

23. H Rothman Family LLC, is a family office and trading firm located at 4 High Ridge Park, Suite 100, Stamford, CT, 06905  that improperly acquired the trade secrets of Plaintiff Kumaran, NRCM, and Plaintiff CTA'1-100 and as listed on NFA Basic, owns more than 10% and has a direct financial interest in Vision Investment Advisors. H Rothman Family LLC maintains proprietary trading accounts in direct competition to Plaintiffs Kumaran, NRCM and CTA's 1-100.

24. High Ridge Futures, LLC is an Introducing Broker located at 4 High Ridge Park, Suite 100, Stamford, CT, 06906. It was incorporated in or around September 2014, shortly after Vision Financial Markets, LLC was effectively disbarred in June 2014, and by piercing the corporate veil, essentially is the same company, new name as Vision, that remains on Vision Financial Markets servers, owned and operated by Boshnack, Rothman and Felag and the same management team.

25. High Ridge Holding Corporation, LLC is a Limited Liability Company located at 120 Long Ridge Road 3, North, Stamford, CT 06902. It was incorporated in or around January 2015, after Vision Financial Markets was effectively disbarred. Defendant John Felag's interest is vested with Holding Corporation, and is owns over 10% interest in High Ridge Futures, LLC.

26. Gerard Stephan Lazzara also uses the name Trey Lazzara, "Lazzara", is an individual located in Austin, TX, and is the introducing broker, involved in the fraudulent conduct in this complaint and upon belief is majority owner and has dominion and control over Lazzara Consulting, Inc.

27. Julie Villa is an individual located in Austin TX. During the period July 11, 2014 until May 2015, Villa was a registered AP of LCI. During the activities in the Complaint, Villa also worked for LCI and Lazzara as a contractor and/or employee.

28. Lazzara Consulting Inc, "LCI" is a introducing broker located at 11610 Fm 2244, Suite 210 Austin, TX 78738. It operates the website TradeProFutures.com and is owned and operated by Gerard Stephan Lazzara. LCI is a former Vision IB.

29. Samantha Kumaran is a resident of New York City, NY which is within this judicial district. In April 2017 Kumaran became a registered member of the NFA as a Commodities Trading Advisor. Prior to that she was a customer and opened an account as a customer to trade commodities futures in January 2017.

30. Customers 1-100 and CTA's 1-100 are citizens of the United States of America, and are similarly situated to Kumaran, who are also victims of the scheme. They opened accounts with ADMIS after September 2014, and were fraudulently induced by former Vision IB's  and remain unaware their confidential accounts and millions of dollars have been disseminated to Vision.

31. Nefertiti Risk Capital Management, LLC was a minority women owned small business, sole proprietor and LLC, in New York NY that was a direct competitor of Vision. It was also a registered CTA. ADMIS, Vision and NFA, depleted its assets, property and trading strategies, to make the company un-operational, in deliberate and direct unfair competition, for Vision to destroy its competitors, in the scheme herein. Kumaran is the legal successor and assign of the LLC.

## FACTS

### BACKGROUND OF VISION AND THE FRAUD

32. Vision Financial Markets, LLC located in Stamford, CT, was formerly a Futures Clearing Merchant ("FCM") registered with the NFA.

33.  On or around June 20 2014, NFA issued a public announcement available announcing that Vision Financial Markets was effectively barred from Membership   Their public filing stated that NFA acknowledged a pattern of serious disciplinary actions by regulators and that Vision Financial has had a long history of supervisory issues during its tenure as an NFA Member. It had been the subject of four prior NFA Complaints -three of which charged the firm with failing to diligently supervise various aspects of the firm's operations. [2]

34. Vision Financial Market's profiles on NFA Basic Website shows the entity was subject to 172 CFTC Reparations against it as Defendant - cases brought against Vision, its management and owners by harmed customers – a firm with a serious disciplinary track record of violations, that customers, including Plaintiffs would not choose to do business.

35. In or around 2010 Vision was fined $500,000, specifically list Vision's risk management failures in options risk management on futures and caused losses to customer of millions of dollars. The risk

---

[2] https://www.nfa.futures.org/news/newsRel.asp?ArticleID=4428

manager of Vision at the time was John Felag, and under the supervision of Howard Rothman and Robert Boshnack.

36. Three years later, however, in or around 2013, Vision's gross negligence and failures in risk management specifically in commodities futures options trading, caused customers to lose another $2.1 million. Vision Financial Markets was fined $1,500,000 and paid approximately $2 million in customer restitution. Complaints filed cited Vision's failure to observe high standards of commercial honor, failure to observe just and equitable principles of trade, failure to maintain adequate records, and failure to supervise.

37. However despite public statements that Vision would exit the business it did not. By piercing the corporate veil, its owners Howard Rothman and Robert Boshnack, in their individual capacity, tailored a deal, in or around September 2014, by which they would simply change the name of Vision, form numerous other affiliates, including but not limited to High Ridge Futures, High Ridge Holding Company, LLC Vision Investment Advisors, and partner up with ADMIS.  Same company, new names.

38. Vision Financial Markets, LLC is still in existence and operation, continues to be subject to other fines and grievances of misconduct from the SEC[3] and CFTC [4]and is owned by Howard Rothman and Robert Boshnack. It still maintains the firm's operations, and most recent SEC filings show-it maintains headquarters, computer assets, networks, servers, and other business operations, which are shared with its affiliates, all affiliates named in this Complaint upon which the trade secrets and other financial compensation alleged in this complaint were transferred to

39. Concealed from the public, in what appeared to be a straight transfer of business to ADMIS, was that behind the scenes, Boshnack and Rothman, in their individual capacity, agreed to essentially buy their way back into the business, and provide substantial personal financial incentives and

---

[3] https://www.goodetrades.com/2019/04/sec-fines-clearing-firm-vision-financial-markets-llc-625000-for-failures-to-file-sars-about-penny-stock-deposits/
[4] https://www.cftc.gov/PressRoom/PressReleases/7973-19

undisclosed personal guarantees on its network of Vision IB's -  Introducing Brokers that were previously clearing through Vision. ("Vision IB's).

40. The catch - in exchange for millions of dollars of financial incentives from Boshnack and Rothman to ADMIS – ADMIS would secretively distribute its customers and CTA's confidential and proprietary financial accounts, behind the scenes, (without the customers and CTA"s knowledge, consent or authorization) to Vision and its owners, employees and affiliates, to access their trading strategies.

41. The second catch -  ADMIS would pass through unauthorized fees to the victims, to fund Vision's owners, employees and affiliates upon belief, estimated to exceed ten  million dollars a year, to customers which it would materially and fraudulently conceal in the account opening.

42. The third catch -  after ADMIS disseminated all its CTA's competitive algorithms to Howard Rothman and Felag, Vision set up another affiliate called Vision Investment Advisors, Inc to directly trade in competition with all the CTA's who financial accounts it had unlawfully gained access to – while ADMIS, in direct unfair market competition, continued to give Vision, preferential rates, discounted commissions, and sell-out its competitors trade secrets.

43. This conduct directly violates the intent of the Commodities Exchange Act, thwarts fair market competition and has harmed dozens of customers and CTA's, not just by the unlawful overcharges estimated to be over $50 million dollars, but the attrition and theft of intellectual property, trading strategies and destruction of new CTA's entering the business, who's account have been pillaged and distributed to be offered to Vision to gain an unfair competitive advantage.

44. The fraud is perpetuated by a ring of about 80-100 former Vision Introducing Brokers that were transferred over to ADMIS from the former Vision Financial Markets, LLC, in or around September 2014, collectively called Vision IB's, that are located over the United States. Incorporated by reference Exhibit 3, is a list of some of the Vision IB's upon information and belief participating in the fraud.

45. The Vision IB's with the full participation and knowledge of ADMIS, Vision, including Defendants Lazzara, LCI, and Villa named in this Complaint, used interstate wire and telephonic

communications to solicit customers to open futures trading accounts at ADMIS who by omission and fraudulent concealment then distribute them to Vision's owners, employees and affiliates. The scheme is perpetuated with scienter to deceive. Vision IB's together with ADMIS and Vision conspire on the overcharges to be passed through to customers – ultimately to generate revenues for Defendants.

46. Upon information and belief, the overcharges range from 0.30cents to $6 a trade which are willfully added only *after* the account is open, in violation of NFA 2-26, and disguised as trade processing fees and transaction fees. This timeline makes it harder for customers to dispute the charges, and close the account. It also violates the CEA. As part of the fraudulent sales and solicitation, ADMIS at all times materially omits and conceals and/or misrepresents that those fees are being wired across interstate lines, with cash deductions from customer accounts to pay Visions' owners, employees and affiliates.

47. Further, the scheme is designed to deceive and "be careful" CTA's don't find out – as the conduct violates Federal law. ADMIS and Vision IB's and Defendants and other conspirators, willfully conspired to reduce the overcharges to CTA's to $0.30 cents a trade, as CTA's are more price sensitive and more likely to detect the fraud if they notice higher over charges. In return Vision's owners, employees and affiliates, improperly acquire and gain unauthorized computer access, across interstate to their competitors CTA trading account. For innocent customers, also victims of the scheme, overcharges can be as high as  $6 a trade, which are being disgorged from their account, to fund Vision's new businesses and Defendants herein.

48. Defendant and its conspirators meanwhile have been unjustly enriched, and the market place fraud continues to date with hundreds of customers and CTA's still unaware that ADMIS has distributed their confidential futures trading accounts to Vision's owners, employees and affiliates.

49. Another linchpin of the fraudulent scheme is the shared office facilities, servers, networks, computers, employees, back-up drives, and other primary office infra-structure. Once the trade secrets are improperly acquired they are transferred, copied, uploaded, downloaded using interstate wires onto servers, owned, controlled, and remote hosted by Vision Financial Markets, LLC.

50. Through a network of file sharing, and corporate veil piercing, all Vison Defendants in this complaint, and affiliates, including those that operate directly competing trading arms, namely Vision Investment Advisors, H Rothman Family Office, Boshnack Family Office, High Ridge Holding Corporation, High Ridge Futures, and the individual named individually as Defendants.

51. Further, there is no firewall of sharing of human resources and personnel between the trading defendants and the multiplicity of corporate entities, all veil pierced by Rothman and Boshnack. The very same key individuals, John Felag, Robert Boshnack and Howard Rothman, oversee, direct, control, operate and execute decision making on all the Vision affiliates and cannot execute a firewall between their own simultaneous duties.

52. For example, and without limitation, John Felag is still currently listed as Chief Risk Officer for Vising Financial Markets, LLC with shared emails with High Ridge Futures, and simultaneously his employment and vested financial interests is with High Ridge Holding Corporation, vested with the management authority. His shared roles and resource also directly impacts trading on Rothman Family, LLC and Boshnack LLC Felag is responsible for risk management for both customer and proprietary trading activities, which includes decision making authority on all Vision defendants trading activities.

53. Felag was also the key individual and employee responsible for the improper acquisition of Plaintiffs and all CTA's in this Complaint, and has shared duties, with all Vision defendants. Upon information and belief, all trading strategies and risk management strategies are shared on the same infrastructures, used and accessed by all Vision affiliates, who have a vested trading interest. with trade secrets improperly obtained by the same key personnel in directly competing activities.

## TRADE SECRETS

54. Samantha Siva Kumaran ("Kumaran") is a British born, US Citizen residing in New York City, NY. Kumaran earned a First Class Masters and Bachelors, in Applied Math and Theoretical Physics from the University of Cambridge, UK.

55. Plaintiff includes by reference Exhibit 1 paragraphs 21-32 by reference in detail describing the trade secrets their protections, and reasonable measures hereunder.

56. During the period 2011 until present date Kumaran, as the sole owner and inventor, of trading algorithms, specifically designed for the commodities options markets, and are designed to give her a competitive advantage both in risk management as well as a CTA. The options modules are in direct competition with the programs that Vision was disbarred for.

57. Kumaran's CTA trading programs can be summarized as quantitative commodity options trading strategies that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage. Successful performance enables the investor to accumulate returns by reinvesting over a longer period, as well as take profits in shorter period.

58. The trading and risk management strategies, for the CTA, were borne from substantial investment of time and significant investment, cost, time  and development by Kumaran. They were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, and to generate the options trades to give Plaintiff  a commercial competitive analytical advantage.

## JULIE VILLA SOLICITS ACCOUNT

59. On or around December 11 2016, Plaintiff while reviewing equities trading software programs, spoke to a Julie Villa, ("Villa") who represented herself solely as an equities broker for Garwood. Plaintiff indicated it was starting two hedge funds, one in securities (equities trading) and the other in commodities futures and options trading.

60. Villa represented to Kumaran disclosed only her employment as an equities broker and materially omitted in the conversation her long and extensive role in the commodities futures business. To propagate this deception, Villa willfully provided links to only one of her two distinct LinkedIn Profiles, where Villa fraudulently maintains two distinct LinkedIn profiles to materially

concealed her discontinued role with an Introducing Broker ("IB") and omit customers knowledge of her role in the Commodities Futures Markets.

61. On or around December 16 2016, Villa, by telephone conversation from her offices in Austin Texas, solicited Kumaran in New York City, a newcomer to the futures industry, to open a commodity futures account for trading options through her former employer through former Vision IB Trey Lazzara ("Lazzara"), of Lazzara Consulting ("LCI") located out of Austin Texas.

62. Villa during the solicitation, at no time disclosed her long standing, in-depth employment and contractual relationship with Lazzara, nor his ongoing open and active dialog with the disbarred Vision management team, materially and fraudulently concealed from Plaintiff that she was in fact a former employee of LCI, concealed that she was no longer and/or had ever been registered as an AP, and therefore was not permitted to be soliciting commodities futures accounts.

63. At the time of Villa's solicitation, Villa was unregistered as an Associated Person ("AP") and was not permitted to be soliciting or marketing commodities futures accounts.

64. Villa also materially failed to disclose her long standing active participation with Vision and Vision IB's to disseminate customer and CTA"s confidential and proprietary commodities trading accounts to Vision. If Villa had disclosed her role as an AP, Plaintiff would not have pursued business dialog. Villa's conduct violated amongst other laws. NFA  Rule 2-29(b)  , NFA Rule 2-26 / CFTC Regulations 1.55 Part (l) , 1.55 Part (i), NFA Bylaw 301(b).

65. According to NFA's membership records, Villa was registered as an AP of Lazzara from July 11, 2014 until May 18, 2015, which meant she was part of the sales force that was transferred from Vision, after the firm was reported disbarred for manipulative trading practices in 2014, resulting in over $2 million in customer losses, and the transfer of Lazzara to ADMIS.

66. Villa therefore had material knowledge of the scheme and the fraud, had been an active participant in disseminating customer accounts to Vision employees and affiliates, and knew, when she referred the account to Lazzara, that it would be diverted to Vision.

67. Upon information and belief, Villa was compensated for her referral and acquired personal financial benefit from Plaintiff's accounts she solicited to be opened at LCI and ADMIS, even

though she was not registered as an AP in violation of the exchange rules, and accrues financial benefits and incentives from her ongoing relationships with Lazzara and Vision defendants.

**LAZARRA KNEW PLAINTIFF WAS A CTA TARGET**

68.    In or around December 16 2016, after referral and solicitation from Villa, Kumaran entered into conversations with Introducing Broker ("IB") called Trey Lazzara in Austin Texas regarding opening a Futures Clearing Merchant ("FCM") account.

69.    Kumaran notified Lazzara that it had passed its Series 3, the registration standard to become an NFA Member, was in the process of registering as a Commodities Trading Advisor ("CTA") and to form various hedge funds so that it could leverage its trading programs, in a competitive manner. Lazzara had direct knowledge of its intention to use its proprietary account to create a track record and was being used to create economic and commercial advantage.

70.    Kumaran advised Lazzara at the time, she had an extensive background in risk management consulting where she had run her own successfully risk consulting business, and was the sole owner of various proprietary risk management software programs.

71.    Kumaran also advised Lazzara, that she had had invested substantial resource, time and effort to  develop proprietary commodities futures options trading algorithms, which could give her a substantial competitive advantage in the options on futures, and generating returns for investors, and the purpose of opening which were for launching

72.    Kumaran's option trading programs and risk management services, software and programs derive substantial competitive advantage. Kumaran had also invested substantial money and capital to form the hedge funds and entities, for which it intended to compete, and grow a trading business. By virtue of its secrecy of its options trading programs, Kumaran would have unique competitive advantage as a CTA in being able to attract capital, register its funds and grow its career as a commodities trading advisor.

73.    Lazzara knew and had material information that Kumaran's career in both risk management services, consulting, software design as well as Kumaran's options trading algorithms were in **direct**

**competition** with Vision, its owners, employees and affiliates. Kumaran was not offered any choices in which FCM it could select, and Lazzara knowingly and intentionally aggressively pursued Kumaran's account opening only at ADMIS.

## FRAUDULENT CONCEALMENT OF RISK OPERATIONS

74. On dates including December 18, 2016, January 18, 2017, January 22, 2017  January 30, 2017 Lazzara and Villa fraudulently concealed and materially omitted, while maintaining active communications with Visions team, that by virtue of opening an account at ADMIS, Kumaran's account would immediately be disseminated to Vision in Stamford CT who were inherently interested in acquitting Kumaran's risk management and options trading strategies.

75.    Kumaran also advised Lazzara it had advanced CME compliant risk management software for quantification of commodities options and futures risk. Lazzara knew, that these capabilities and provision of services, were in direct competition with those of John Felag and Vision affiliates.

76.    Because of Kumaran's extensive professional background in risk management, Kumaran inquired specifically of Lazzara to describe the risk management policies and procedures at ADMIS.

77.    Lazzara, knew that risk management was outsourced to Felag and Vision affiliates and materially and fraudulently concealed that

78.    Plaintiff made specific inquiry into the risk management operations, margin methodology and processes at ADMIS.  Under NFA Rule 2-26 and CFTC 1.55. and CFTC 33.7, Lazzara and LCI are required in their solicitations, to disclose all their risk management policies and procedures expanding upon anything that would be misleading or could deceive a customer.

79. Kumaran specifically requested information on the risk management technologies being used ot monitor options risk, the margin procedures being used to calculate performance bond margin on commodity options were compliant with CME – or if some proprietary options margining was being used -  and for all information related to the options management, Against Lazzara made deliberate fraudulent omissions and concealments.

80. Despite the express requirement of Lazzara and LCI to disclose their risk policies and procedures, Lazzara and LCI, acting together in conspiracy with Vision, Felag, Boshnack and Rothman and other Vision affiliates, fraudulently conceal in sales and telephonic communications, using interstate and wire communications, to Kumaran in New York City deliberately, intentionally, fraudulently omitted and materially concealed, that

81.   On all dates between December 2016 and January 2017, included by reference in Exhibit 1, ADMIS, in conspiracy with Lazzara and LCI, with intention to deceive, during the sales and solicitations even though Kumaran and NRCM were requesting specific information about the risk management policies and procedures, fraudulently concealed and materially omitted to disclose and material information about its risk program including but not limited to :

    a.    that it had material risk management policies and procedures that required Kumaran's account be handled and fully disclosed to Vision affiliates, owners and employees, in violation of CFTC 1.11, NFA 2-26, NFA 2-29, NFA 2-2;

    b.    that it had materially outsourced the handling of margin calls and risk management duties to Vision affiliates, owners and employees which included delegation of authority to liquidate its account, extend credit on the account and place trades on the account without customers knowledge, consent or permission in violation of CFTC 1.11, 7U.S.C.§ 2 (c)(v)(IV)[5]

    c.    that unauthorized fees, would be added after account opening, concealed prior to the account being open. These fees are being charged in express violation of the CEA, CFTC 33.7 and NFA Rule 2-26.

    d.    that all the CTA trading strategies, confidential and proprietary information would be disclosed to its competitors and other NFA Member, without customers and CTA's knowledge, consent and permission in violation of NFA 2-4 9061 and DTSA;

    e.    that the owners of Vision, Howard Rothman, Robert Boshnack and Vision affiliates had extended material personal financial guarantees on  Plaintiff's accounts, which were material considerations to which Plaintiffs would have made a decision to not open an account, and chosen to do business elsewhere in violation of NFA 2-26/CFTC 1.55;

82. The concealment of these authorizations on Plaintiffs' accounts were material. Plaintiffs reasonably relied to its detriment on the misrepresentations made by and on behalf of the Defendants, and have been harmed accordingly.

---

[5] 15 U.S. Code § 78g (2)(A),§ 78g (2)(B),  NFA 2-26  17 CFR§1.57 (c.),  NFA  2-26 / 17 CFR § 1.55 Part (k);

83. Defendants and its conspirators knew that, if Plaintiffs, knew of the foregoing concealments, omissions and other misrepresentations and Vision it would chose not to business with ADMIS, so they intentionally concealed, with intention to deceive.

84. Each of the defendants in the named conspiracy, herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

85. All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.  The fraudulent scheme perpetrated by the defendants was designed to, and in fact did, result in the Plaintiffs opening accounts, transferring assets, funds, property and making payments  and collecting fees to the benefit of and on behalf of the defendants.

86. Plaintiffs had a right, as expressly provided under the CEA, and the laws and Federal statutes to disclosure of the foregoing information prior to account opening, and accurate, honest and facts about the handling of its account. The anti-fraud provisions of the CEA, specifically prohibit fraudulent and deceptive conduct, and the account were fraudulently induced accordingly.

## MOTIVATION FOR FRAUD

87.    Vision IB's including Lazzara had a clear motive for the fraud. Vision IB's are usually one or two man sole props, small businesses who upon information and belief, do not have sufficient credit worthiness  or  financial  capital  to  clear  their  futures  trades  independently  through  ADMIS. Therefore, they were motivated to receive an interest-free credit line from Vision's owners and affiliates, and get to stay alive and in business after Vision Financial Markets was disbarred.

88.    They also received the concrete benefit of being affiliated with a large "brand" name  ADM, which boasts itself as the 8th or 9th largest FCM in the world.  This in turn made sure Vision IB's would go out and solicit numerous unsuspecting customers, in exchange for large commissions sharing on the transactions generated through trades in accounts opened through ADMIS.

89.    By participating in the fraud, Vision IB"s and Lazzara  also were rewarded with the concrete benefit, not only interest free credit lines, but the brand name ADMIS, a large global firm, whose

parent company is a Fortune 100 company, to their customers. This in turns gives brand name credibility to these tiny one-or-two-man former Vision IB's remotely scattered around the US.

90.   The most tangible benefit of all, was that Vision IB's were given a non-industry standard credit-line free -pass into ADMIS – a substantial financial motivation. As a result of the fraud, to induce the Victims, to transfer monies to ADMIS, and disclose their proprietary and trade secret information, which in turn was disseminated to Vision employees, owners and affiliates Vision IB's as  concrete benefit from participating in the scheme, would secure the direct and tangible financial benefit, where Vision IB's were required zero credit to support their business.

91.   IB's having zero credit worthiness of financial guarantees is highly unusual in a competitive IB environment, and completely dissimilar to other IB's who open with ADMIS. Upon information and belief,  all other IB"s under ADMIS are required to post financial guarantees and demonstrate substantial credit-worthiness. Vision IB's including Lazzara received  a "free pass" of a zero credit and were unusually required to make zero deposit– to support the business they brought to ADMIS.

92.   In exchange however the financial and concrete benefits, Vision IB's flouted their compliance laws, independent duties under the CEA, hiding under the ADMIS umbrella, and instead intentionally deceived and defrauded their customers and CTA's, (i) secretively transferring all their trading strategies and confidential account information (ii) participating in unfair market competition for Vision to deplete their performance records, (iii) securing significant overcharges to be transferred to compensate Vision, and other conduct alleged herein.

93.   Vision IB's and Lazzara, LCI in accrual of their financial benefits, knowing deceived their customers and smaller CTA's – to stay themselves in business.

## CONSPIRACY TO DEFRAUD

94. Shortly after initiating communications, Lazzara contacted various unknown persons at the former disbarred Vision Financial Markets, LLC, Howard Rothman, Robert Boshnack, John Felag and their affiliates, that a newcomer competitor, Kumaran was forming a commodities options

trading hedge fund and fraudulently concealed those communications from Kumaran. and also had advanced risk management strategies for options trading, as a risk services provider.

95. With willful intent to deceive, and knowing that Vision affiliates had a direct competitive interest in  Kumaran's CTA trading strategies and professional background in risk management services, Lazzara fraudulently concealed his dialog with Vision, its owners, employees and affiliates and conspired to lure Kumaran into opening an account with ADM Investor Services ("ADMIS"), whereby Vision could gain fully disclosed access to Kumaran's competitive trade secrets without her knowledge and consent.

96. Upon information and belief, Kumaran's trading strategies commodities options trading, and were of keen interest to and in direct competition with the trading strategies that Vision.

97.  Public records show that Vision were accused of failed risk management in directly similar options trading strategies and had clear conflicts of interest in improperly acquiring the secret workings of  competitors options trading and risk management and trade secrets,

98.  Vision was in fact fined over $1.5 million dollars in similar options trading, providing a clear motivation, to defraud and acquire competing strategies and risk management methods and processes, and clear economic motivation and concrete benefits in acquiring its direct competitors trade secrets.

99.  Despite their own independent obligations and duties under the CEA and NFA Rule 2-4 906 all defendants including but not limited to Felag, Rothman, Boshnack. Vision Investment Advisors, High Ridge Futures, that were NFA Members, it was against NFA Rules, to view a CTA's trading records without their permission.

100.    In wanton disregard for Plaintiffs rights, at no time, did Felag, Boshnack, Rothman or any Vision affiliates make an attempt to unmask themselves, with scienter, and intention to partake in the fraud, to improperly gain access to their competitors trading accounts, and trade secrets. Therefore  and willfully participated in the secret background communications. Vision and Lazzara, knew and intended to conceal their involvement to enact the scheme, as Kumaran and NRCM would never had opened the account.

101.    At no time did the foregoing defendants ever contact or seek  Kumaran, NRCM or other similarly situated customers or CTA's permission to access their proprietary trading records, notify them of their access. In fact, they took material and overt actions, to conceal and deceive and commit fraud so that CTA"s would not find out. Furthermore, the far reaching pattern of fraudulent conduct by defendants evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, and materially violated the CEA, NFA Rule and anti-fraud provisions

102.    At not time did Kumaran, NRCM or other similarly situated customers or CTA's consent to or grant permission to access their proprietary trading records, notify them of their access.

## LAZZARA HAD A DUTY

103.  On or around January 27, 2017 and again on or around January 30, 2017 Plaintiff was given directives by ADMIS employees that since Plaintiffs account was solicited and opened by an Independent Broker, it was not permitted to speak directly to ADMIS, and its only communications should be solely with its IB, Trey Lazzara and his business Lazzara Consulting, Inc. ("LCI")

104.    Kumaran and NRCM were instructed that all day-to-day communications should be handled **solely by the Introducing Broker** and Lazzara would be responsible for handling the day-to-day communications and answering intermediary questions and supplying all information related to the Account on a day-to-day basis and he should be the contact person.

105.    Lazzara had sole responsibility to transfer information to Kumaran.  Therefore Kumaran was solely reliant on the honest and accurate information to be conveyed to the customer through the IB Lazzara, since Kumaran was not permitted to communicate directly to ADMIS.

106.    Therefore LCI and Lazzara were in the business of supplying information for the guidance of others in their transactions, including the risks protocols and margins on his customers' and CTA's accounts. This put LCI and Lazzara in a position of superiority and influence over Plaintiff, since Plaintiff did not have direct access to the information from the FCM, and LCI and Lazzara had

superior control over the information and Kumaran and NRCM placed trust, confidence and reliance on Lazzara to be honest.

107.    In accordance with his independent ethical duties, and independent compliance duties as a broker, Lazzara and LCI as an NFA member, and a registered IB, were obligated to and had a duty to comply with Commodities Exchange Act, all CFTC and NFA rules and regulations, and a duty not to materially mislead Plaintiff, and was also bound by the anti-fraud provisions of the CEA and NFA rules, which without limitation specifically include NFA 2-2 a provision not to defraud, deceive or mislead others, and disclosures under NFA 2-26 and 2-29.  Further LCI and Lazzara were bound by the all the ethics and compliance duties of other rules and regulations.

108.  Lazzara was aware, due to his position of superiority and influence and control over access to information, that Kumaran, NRCM and other similar situated customers and CTA's,  had to rely on him, as the source of accurate information  Lazzara had a duty to transfer accurate information to Plaintiffs,  a duty to be honest, had a duty to communicate accurate information to Plaintiffs.

109.  Since Lazzara had superior control over the information, and Kumaran and NRCM  placed trust and confidence in the Lazzara to be honest, as is mandated under the laws, rules and statutes.

110.  Kumaran was reliant on the accuracy of information to be conveyed to it through the IB Lazzara.. And Kumaran to its detriment did rely upon the information provided by Lazzara.

111.  But Lazzara, LCI and Villa to intentionally defraud Kumaran to open the account, despite direct questions on how ADMIS managed risk, its risk policies and procedures, did not convey accurate and honest information.

112.  Lazzara and LCI materially omitted in all conversations, that John Felag and owner and employees of Vision in Stamford, CT would be handling risk on behalf of ADMIS.

113.    Only after the account was closed, when Kumaran uncovered the fraud, Lazzara admitted on or around September 29, 2017 that ADMIS had risk management policies and procedures to disseminate Plaintiffs and other similarly situated customers and CTA's confidential trading records to Vision - policies and procedures by admission that Lazzara had materially concealed at account opening in violation of the CEA, and NFA 2-26 and NFA 2-29.

114.    Furthermore, the extensive, and far reaching pattern of fraudulent conduct by Lazzara and LCI evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large.

### ACCOUNT OPENING

115.    Lazzara and Villa repeatedly made overt fraudulent representations using interstate and wire communications to induce Kumaran to open the account at ADMIS,  including artificially lowering commission, on January 30 2017, blatantly lying about the risk management program, policies and procedures, in violation NFA 2-26 / CFTC 1.11, CFTC 1.55 and CFTC 33.7.

116.    On or around January 27, 2017 LCI forward to Vision, confidential copies of personal and private information about Kumaran Confidential and private information under the Federal Privacy Act, included copies of her passport, home telephone numbers, address, financial statements, social security numbers, without Plainitff's consent or permission, in violation of privacy laws.

117.    Once Kumaran had opened the account, the account was secretly, immediately turned over to Vision to unlawfully scrutinize the trading strategies on or around January 31, 2017.

118.    In a repeated and persistent pattern of fraud and deceit, on dates including January 31, 2017 February 1, 2017, March 8, 2017, March 21, 2017, March 23, 2017, and April 10, 2017, Trey Lazzara, using interstate and wire communications from his offices in Austin Texas, to Kumaran in her offices in New York City, to conceal the activity by omission and deception used acronyms such as "risk guy", "dev team", "tech team" to disguise Vision's involvement, cutting and pasting emails so as to pretend they originated from ADMIS; masking domain names; making numerous oral and written misrepresentations; deliberately pretending that "*John from risk*" works at ADM; when in fact it was John Felag; materially in some communications deliberately misrepresenting  Vision as "ADM risk" and "ADM" and/or a "division of ADM". The CEA prohibits fraud and deception. Lazzara at all times, materially omitted and fraudulently concealed Vision's access.

119.    Vision its owners, employees, and affiliates now had acquired by fraudulent concealment, access to all Kumaran's and other CTA's and customers' confidential and financial trading data on

a real-time basis, to study and monitor its trading patterns in direct violation of the Commodities Exchange Act and Defend Trade Secrets Act..

120.    Unknown to Kumaran, ADMIS had now improperly given, without Kumaran's knowledge, consent and permission, fully disclosed access to each and every proprietary trade, transaction and confidential information. This information constitutes trade secrets. At no time did Kumaran, NRCM and or other similarly situated customer or CTA's consent to this access.

## INITIAL ERRORS

121.    As soon as the account was open, however, margin handling on the account was replete with errors and omissions and gross negligence, and in violation of exchange rule compliance. The services were performed by unqualified  and grossly negligent individuals,  with wanton disregard for their obligations by the illegal and fraudulently concealed risk management group.

122.    These material errors in calculations and unauthorized outsourcing of material risk to the unqualified personnel in Vision  violated CME Rule 930, CME Rule 982,  CFTC 1.11-1.15.  CFTC 1.55 in violation of CEA and breach of CME rules, including but not limited to as follows:-

   a.    On or around January 30. 2017 Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value,  that misreported account value and margin change in M/D was a negative loss of -$31,673 on a $25,000 account within a few hours of trading. The information was false and inaccurate and misleading.

   b.    On or around January 30,2017 Plaintiff documented grossly negligent errors also reported a drawdown of $31,256 dollars (negative/loss) when the account had positive value of around $25,000.

   c.    On or around January 30. 2017 Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department and violation of exchange rules in performance bond calculation, erroneously requiring additional margin of $21,325 on a long option transaction  that had a cost and maximum risk of loss of $7.00.

   d.    The performance bond errors, material violations of the CME rules, gross negligence, material errors and omissions, financial misreporting of over 100% of account value.

## INITIAL FRAUD

123.   When Kumaran questioned the material errors in the risk department, Lazzara instigated a pattern of fraudulent acronyms, euphemisms and terminology such as "risk guy", dev team", tech team" and "my risk guy at ADM" and "John from risk", "HR Risk", to deceive Plaintiff that he was speaking to only employees at ADMIS.

124.   On several occasions, Lazzara deliberate misrepresentations and dishonest statements to specifically misled Kumaran that John from risk worked **_at ADM_**, or his risk guy was **_at ADM_**.

>    a)      On or around January 30, 2017, Lazzara, using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, made fraudulent misrepresentations, used deceptive terminology that he was speaking to "*one of the risk guys*" to intentionally mislead Plaintiff that he was speaking to *risk management employees of ADMIS* and fraudulently concealed and omitted that he was communicating with  John Felag and others at Vision affiliates, in order to materially mislead Plaintiff by concealment, of Vision's access to its account.[6]

>    b)      Lazarra continued to mislead Plaintiff in email on January 30 2017, by referring to John Felag and Vision affiliates as the "*tech team*"[7]  and on January 31, 2017 using misrepresentative acronyms the "*Dev team*".[8] Lazzara intended to mislead Plaintiffs that he communications with an IT department of ADMIS, and not disclose that material margin handling and risk has been outsourced to the disbarred employee s of Vision.

>    c)      On or around January 31 2017, Lazzara, using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, made fraudulent misrepresentations, that he works with "*a division within ADM that focuses heavily on managed futures.. this is a good place for you to be*" and misrepresented his business relationship with **_a division of_** ADMIS. This statement was false and untrue, as his relationship he was speaking of to materially conceal he was working Vision, by overtly misstating "**_a division of ADMIS_**". Vision and their affiliates are not a division of ADMIS, and his statements constitute fraud.[9]

125.   Upon information and belief, the repeated reference to Felag and Vision affiliates as technology providers, Development teams, and also "building patches on systems", Vision

---

[6]  Email LCI on January 30 2017 - That was one of the risk guys. He could not create the risk scenario in his 3rd party risk tool because it would not bring up those strikes. The tech team is looking at this now..

[7] Email LCI on January 30, 2017 - The tech team is looking at this now. .

[8]  Email LCI on January 31 2017 - The issue that you were having is believed to be resolved. There was a patch that was added by the Dev team to OAK and the customer portal login so everything should look normal now.

[9] Email LCI on "January 31 2017 - ADM is the 8th or 9th largest FCM in the world. I work with a division within ADM that focuses heavily on managed futures. This is a good place for you to be. It just may take us more than a day to fix some of the issues with your unique situation.

defendants may have had system administrator access to ADMIS' portals, including but not limited to Members1. The online-customer portal, and various IT portals in the back-office.

126.    With security and administrator access and ability to fix patches in portals, and also LCI representing them as "tech team" or "Dev team", upon belief, Vision affiliates and its employees, were authorized to have computer level back-end access to all customer and CTA's confidential trading account at ADMIS. LCI's referral to building patches and fixing portals on a real-time basis, were presented as developmental computer department, which allowed them to gain real-time access to all the confidential trading accounts and passwords, as an administrator does.

127.    Upon information and belief, ADMIS risk platforms, were also being developed by and/or outsourced to Vision, giving them full administrator and system keys login and password to all ADMIS Members 1 risk management platforms and customers personal financial records.

128.    At all times Lazzara materially concealed and omitted that competitors Vision, unqualified had gained unauthorized access and continued to make fraudulent representations related to both the risk management policies, and handling of margin,.

129.    On or around January 31, 2017 LCI using interstate and wire communications admitted more material deficiencies, that the risk management group did not have intraday options capabilities to monitor transactions where Plaintiff or a customer owned 100% of the Open Interest in the Heating Oil options markets, and then persisted the deceit in failed risk management by claiming "*the margin errors you were having yesterday are resolved*" and again misrepresentations in email on February 1 2017 "*The issue that you were having is believed to be resolved…There was a patch that was added by the Dev team…*"  and "*I believe the patch fixed the problem*."[10] However the statements were materially false when made.

130.    However the errors were not resolved, there was no "*patch added*", and there was no "dev team", or "tech team". LCI was instead fraudulently misrepresenting his communications as to be with computer departments, instead of truthfully disclosing Vision. This conduct violates  CEA.

---

[10] Email LCI February 1 2017 - The issue that you were having is believed to be resolved. There was a patch that was added by the Dev team to OAK and the customer portal login so everything should look normal now.

131.    Rather than be honest, Lazzara continued to deceive and mislead, that risk management was being outsourced to Vision Financial in Stamford CT, at all times misrepresenting to Plaintiff that ADMIS was "fixing" the Portal and it the problems would be remedied. Kumaran and NRCM did rely on Lazzara representations and in February 2017 made the switch to WTI Crude Oil

132.    But in fraud and ongoing material unsupervised violations of the Commodities Exchange Act, the only "fix" that was being fraudulently enacted in Plaintiff's proprietary account, was that competitors Robert Boshnack and Howard Rothman (owners of the disbarred Vision) were given discretionary authority to artificially add leverage and "buying power"  in the account, and using a non-compliant fictional calculation called "margin allowances".

133.    Lazzara's statements were false when made, and intended to continue to induce Plaintifffs to remain trading at ADMIS.

134.    When Plaintiff reported the errors, LCI continued the fraud that "*ADMIS had fixed it*" and that Plaintiff should switch to Crude Oil, and it was only a problem in Heating Oil.

135.    Kumaran and NRCM reasonably relied on the representations of Lazzara, that ADMIS computer department were fixing patches on a portal. Kumaran and NRCM also reasonably relied on the representations, that switching to Crude Oil would resolve the problem, and it was a temporary glitch.

136.    At all times Lazzara materially concealed and omitted that competitors Vision, unqualified had gained unauthorized access and continued to make fraudulent representations related to both the risk management policies, and handling of margin,.

137.    Even though on multiple occasion, Plaintiff Kumaran questioned the grossly negligent and material errors and omissions in the risk management, and directly questioned the qualification and capabilities of the persons involved in the risk management of its account, material violations of exchange margin rules, in light of the foregoing errors, Lazzara, Felag and their associated entities deliberately, and with malicious intent, continued to deceive conceal, obfuscate, mislead,  and make overt fraudulent representations and directly lie, to Kumaran to conceal Felag and Vision Defendant's unauthorized access to Plaintiffs' account.

138.    Furthermore, the extensive, and far reaching pattern of fraudulent conduct by evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large.

## MORE GROSS NEGLIGENCE IN VISIONS RISK SERVICES

139.    During the course of trading the account, the account was subject to multiple occurrences of gross negligence in the area of risk management and Kumaran, documented screenshots of material errors and omissions in risk management quantification,   material miscalculations of intraday valuation. The errors documented were upwards of 200% of account value, and contained documented  non-compliant margin calculations in violations of the Commodities Exchange Act, CME Exchange Rules, CME Rule 980, 982, 930A and CFTC 1.11-1.15

140.    Incorporated herein and in Exhibit 2, is a further documented list of errors and omissions, that showed a wanton disregard for the duties to the customer

a.    On or around March 8 2017, at 1.03pm and 1.50pm   and 2:16pm Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department in Crude Oil WTI of over $17,000 intraday profit on a $25,000 account (about 75% of account value), and its liquidation value over $44,000.  The errors were in violation of CME Exchange Rules, intraday valuation, MTM and margin  .

b.    On or around March 21, 2017 at 4:08pm, Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 25% of Account Value,  misreporting intraday liquidation valuation of $28,264.71

c.    On or around March 24, 2017 Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 400% of Account Value, fraudulently financially misreporting intraday change in liquidating value of $96,660 on a $25,000 account.

d.    On or around April 10 2017, Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of 734.23% fluctuation in margin excess and erroneous 62.95% fluctuation in account value and resulted in material misstatements..

e.    On or around May 12, 2017 Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department and violations of the CEA, misreporting financial valuation of over 400% of Account Value intraday change in liquidating value of $93,462.64

f.      On or around May 15, 2017 Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 33% of Account Value misreporting working order intraday margin for buying 1 call options at $9,138.50

g.      On or around May 15, 2017 Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value, misreporting working order intraday margin for buying 10 call options at $29,136

h.      On or around May 16, 2017 at 9:24am,  Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value, misreporting intraday Net Liquidating Value of $27,855.35.

i.      On or around May 16, 2017 at 10:08am Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value, misreporting intraday Net Liquidating Value of $37,445.35.

j.      On or around May 17,  2017 at 1:05pm, Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 200% of Account Value, misreporting intraday liquidation valuation of $34,761.10

k.      On  or  around  May  17,  2017  whereby  between  11.37am  and  12.30pm Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of intraday margin calculation are shown within hours apart on the same day falsely reporting Plaintiff had suffered a wrongful -$20,520 negative decline in liquidating value (which amounts misreporting a derivatives loss of 80.2%  financial loss of account value)

l.      On or around May 17, 2017  between 12.30pm and 1.30pm Plaintiff documented gross negligence,  material  errors  and  omissions,  financial  fraud  and  misreporting  in  the  risk department of  false  reporting  of  a  reversal  of  intraday  gain  now  of  +$17,140.00 (which amounts misreporting a derivatives gain of 68.6%  financial loss of account value).

m.      On or around May 17 2017 at 1:14pm  Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value, misreporting intraday liquidation valuation of $46,001.10.

n.      On or around May 17 2017 at 11:37am Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department  of over 200% of Account Value,  misreporting an enormous intraday MTM Gain and change of liquidating value now showing a profit of $68,490

o.      On or around May 17 2017 at 11:53am  Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department  of showing errors 300% of Account Value, misreporting intraday liquidation valuation of $53,991.10.

p.    On or around May 17 2017 at 1:17pm Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department  of over 200% of account value, misreporting intraday liquidation valuation of $46,481.10.

q.    On or around May 17,2017  at 1:35pm, Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department  of over 200% of Account Value, misreporting an intraday liquidation valuation of $54,991.10.

r.    On or around May 17,2017 at 1:39pm Plaintiff documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 200% of Account Value, misreporting intraday liquidation valuation of $54,131.10

141.   At all times Lazzara and LCI stated that Plaintiffs findings were accurate and there were grave material deficiencies in the calculations in the risk group.

142.   Despite the gravity and seriousness of the situation, and Kumaran's repeated requests for information on the clearly documented intraday margin calculations and handling of risks on its account, Lazzara, persisted in the defraud and deceit to conceal that risk management and handling of margin had been illegally outsourced to the unqualified Vision employees, owners and affiliates.

143.    Fraudulently concealed from Kumaran, was that the grossly negligent risk services were being outsourced to Vision, who had cause over $2 million dollars of customer losses in options traders, were wholly unqualified and  using materially deficient technologies and electronic platforms, that did not even have capabilities to monitor all strikes, and later admitted all their systems were "broken" and incapable of handling intraday margin on derivatives.

144.    Furthermore, the extensive, and far reaching pattern of fraudulent conduct by evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large.

### PERSISTENT FRAUD  CONDUCT – RISK INQUIRIES

145.   As evidenced below, Lazzara and LCI on several dates, in a continuous pattern of deceit, propagated his deception and fraud, fraudulently concealed by using deceptive terminology and material omission, and also intentional misrepresentation fraudulently

146.   The conduct engaged directly violates the anti-fraud provisions of the Commodities Exchange Act, as well as NFA Member compliance Rules 2-2 and the anti-fraud provisions of the CEA Plaintiff was willfully an intentionally deceived.

   a.   On or around March 21 2017, Lazzara using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, that he spoke to "*my risk guy at ADM*" to materially deceive Kumaran he was talking to ADMIS employees. Lazzara materially concealed by omission and misrepresented his multiple communications related to the risk management on Plaintiffs account were with Felag the former Vision, the risk management and not ADMIS to deceive and defraud. [11]

   b.   On or around March 23 2017, Lazzara using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, fraudulently concealed and materially omitted that he was speaking to John Felag and others at Vision affiliates, and used deceptive terminology that he was speaking to "*a risk guy*" to intentionally mislead Plaintiff, he was speaking to a risk management employee of ADMIS.  He fraudulently concealed he was speaking to was John Felag from Vision affiliates, and materially misled Plaintiff by concealment and omission[12]

   c.   On or around March 24 2017,   Lazzara, using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, made fraudulent misrepresentations,  and fraudulently concealed and omitted that he received an email "*from a risk guy at ADM*" in order to willfully conceal and deceive Plaintiff he was speaking to ADM. He had in fact received the email and other communications from John Felag and others at Vision affiliates in CT< and intentionally misrepresented he was speaking to ADM.

   d.   On or around May 12 2017, Lazzara, using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, used acronyms and short-hand names of "HR Risk" and "ADMIS Risk" to materially deceive Kumaran that HR was an acronym for Human Resources. The email was designed to be  fraudulently conceal and disguise that risk management operations in Stamford Connecticut, were being conducted by Vision, instead of ADMIS.

   e.   On or around May 12 2017, at around 4.30pm from his cellphone Lazzara, using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City with deliberate intention to deceive, stated he had spoken to the risk

---

[11] Email LCI March 21 2017 - I just got the following from **my risk guy at ADM**. Just wanted to give you an update that I spoke with ADMIS yesterday and they are discussing internally on the best course of ac☐on to take and will get back to me with an update maybe today if not early next week.

[12]Email LCI Mar 23 2017  "As I mentioned I talked **a risk guy** today that acknowledged the issue and is going to raise the issue with the developers. I would suggest not using the portal at all until it is fixed except to view your statements."

guy at ADM, and there was no requirement to post additional margin, The statement was false, he was fraudulently concealing his communications with John Felag and Vision affiliates.

f.    On or around May 12, 2017 using interstate wire and telephonic communications, Lazzara fraudulently misrepresented intraday margin requirements on Plaintiffs account and despite the gravity of serious CME compliance, material questions by Plaintiff on the risk procedures being used by ADMIS, fraudulently concealed margin was being handled by Vision, and that instead Lazzara was maintaining active communications with John Felag, Howard Rothman and Robert Boshnack  and Vision.

g.    On Monday May 15, 2017, at around 6pm, Trey Lazzara, using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City NY at 212-431-5098 made materially fraudulent representations that he had spoken to a risk person **at ADMIS** who had authorized $134,000 of intra-day performance bond margin on Plaintiffs' account. The information was false. In reality, Lazzara had spoken to John Felag and Vision who had unauthorized discretionary authority in risk on Plaintiffs account and provided fraudulent information on Plaintiffs margining. The fraud was material, and Plaintiff relied on erroneous and deceitful information in violation of the Commodities Exchange Act. This leverage was more than 500% of account value.

h.    On or around May 16, 2017 at or around 8am, Howard Rothman in Stamford CT, and Robert Boshnack, in New York City, NY made interstate wire and telephonic communications to Lazzara, and were directly managing, overseeing and wrongfully involved in the risks and trading of its competitors  CTA account, demonstrating their direct oversight made phone calls to Trey Lazzara, in Austin TX, and instructed Lazzara to fraudulently conceal their involvement on Kumaran's and NRCM's account. To perpetuate that concealment, on or around May 16, 2017 Lazzara, then emailed to Kumaran using interstate wire and telephonic communications to New York City,and fraudulently disguised

i.    On or around May 17 2017, Kumaran from its offices in New York City, spoke to Dave Glancy directly at ADMIS risk department in Chicago, IL, and inquired why it was receiving inconsistent and inaccurate communications, regarding margin requirements. Glancy by fraudulently omissions, materially concealed from Kumaran that this authorization came from Vision, and directly participated in the fraud to conceal John Felag's material mishandling of the account – despite the serious financial ramifications to Plaintiffs.

j.    On or around May 24 2017, Trey Lazzara, using interstate wire communications from his offices in Austin Texas, to Plaintiffs offices in New York City, used "masked domains" and concealed emails, to conceal the email addresses and domains of Vision, and misrepresented in email that "*John from risk*" worked at ADMIS to deceive Kumaran that his communications were originating from ADM.

147.   Lazzara knew the statements were false intended to deceived Kumaran, as Vision had fully

disseminated its CTA trading account.

148.   Given the express requirements of the anti-fraud provisions of the CEA and other NFA requirements, reasonably relied on his representations that these were employees of ADM and had reasonably relied on the misrepresentations.

149.   Upon information and belief, records showed there are dozens of other customers at LCI who's customer accounts and confidential records who had also succumb to the same fraudulent scheme and who's accounts were being overcharged fees and disseminated to Vision affiliates.

150.   Felag and Vision owners' Boshnack and Rothman, who were directly overseeing, knowledgeable and managing the conduct, and Vision affiliates, also actively participated in the fraud, as they as NFA Members knew, it was prohibited for them to access other CTA's accounts repeatedly and persistent committed fraud to deceive Plaintiff and disguise and conceal Vision involvement.

## ACCOUNT SABOTAGE AND TORTIOUS INTERFERENCE

151.   On or around April 20, 2017 Kumaran's CTA account performance was proving out and showing higher than average returns in its options trading strategies, at over 12% over sixty days.

152.   On or around April 24, 2017, Lazzara using interstate and wire communications stated he was scrutinizing the trading strategy and had instead of investigating various expiration fees and options charges for and was more interested in how the strategy had generated profits. Further recognizing their competitor's account had thus far proven to be profitable, and overtaking their own CTA's record, upon information and belief, LCI and was in direct communication with Felag, and Visions' direct competitor affiliates who had fully disclosed unlawful access were also involved in scrutinizing the performance history record, after Trey Lazzara's direct comments.

153.   On or around April 25, 2017, LCI unlawfully distributed Kumaran's and other customer and CTA's trading accounts to Julie Villa,  another unregistered associated person. Upon belief Villa was located in Hawaii, and had remote login access to access all of LCI's.

154.   Upon information and belief, Villa was not an employee of LCI, did not at any time during the unlawful acquisition of trade secrets and customer data, register with the NFA, and maintained affiliations with numerous competitive business interests, including Vision defendants.

155.   On or around May 2, 2017 – competitors and strangers - Boshnack, Rothman Felag and other Vision affiliates who had been granted unauthorized computer access into their competitors Kumaran's CTAs trading account, in violation of NFA Rules,  willfully and intentionally tampered with financial controls, added on further unauthorized fees, and tortiously interfered with and sabotage their competitors, Kumaran's CTA's trading performance, in express violation of the CEA, and direct espionage.

156.   Further, on or around May 2, 2017 Vision and its affiliates, to deliberate thwart competition of Kumaran CTA's account, began withdrawing and scalping <u>additional</u> cash deductions from Kumaran's CTA performance records (after wrongfully acquiring inside access to the account from ADMIS), to reduce the profitability on the account.

157.   The adding or unauthorized fees, midway through a profitable competitors trading account is expressly forbidden under the Commodities Exchange Act.[13]   At no time did Kumaran or its affiliates authorized, approve, consent to or grant permission to these fees.

158.   Kumaran's CTA trading program is an automated program, that relies on accurate prices and calibration to the market. Since it also transacts commodities options, which sometimes have premiums of less than a $1.00 or as low as $0.10, concealing an additional of a fee even in the amount of 30 cents was a material adjustment to its account.

159.   To disguise and make the addition undetected, the fees did not appear on the online platforms. The addition of these fees caused significant damage to Kumaran's automated options trading program and the execution of trades and was a material destabilization of the program,

---

[13] NFA Rule 2-26 / CFTC Reg 33.7 (b) (2)  / CFTC Reg 33.7(c)   CFTC Reg 33.7 (f) / NFA Rule 2-4  Int Not 9005

160.   As a direct result of the malicious and tortious interference Plaintiff's CTA trading performance and competitive advantage was materially harmed and it was executing trades not in calibration with the market and its program was intentionally destabilized.

161.   Lazzara and LCI, in express violation of his duties as an IB, intentionally and knowingly failed to notify or seek consent from customer, fraudulently concealed the fees, materially omitted in communications their addition, failed to seek consent from his customer, and failed to notify Kumaran of the fees.

162.   The actions showed a wanton disregard for Plaintiff's rights evinces a high degree of moral turpitude and wanton dishonesty.

163.   On or around May 5, 2017 Kumaran again requested direct information on the risk management policies at ADMIS. Lazzara, fully aware that Vision was operating the risks behind the scenes, fraudulently concealed and materially omitted that Vision affiliates had been delegated authority to handle margin and approvals of risk on Kumaran's account.

164.   Despite direct requests, on or around May 5 2017 Lazzara, using interstate and wire communications made deliberately false and misleading statements that ADMIS had "no intraday margin policy" and acknowledge systemic failures in calculations in risk management stating the company was "*flying blind*" and "*a disaster waiting to happen*". Again by concealment he omitted Vision's unauthorized access and handling of margin and risk.

165.   On or around May 15, 2017 at around 6pm Lazzara using interstate wire and telephonic communications from his offices or cellphone in Austin Texas, speaking to Kumaran in her offices in New York, NY, made fraudulent statements, that he had just spoken to ADMIS, and that ADMIS had authorized an intraday margin credit of $134,000. The information was false was spoken.

166.   Upon information and belief, Lazzara had instead spoken to Felag, Rothman, Boshnack at Vision affiliates and had not spoken to ADMIS. Instead Vision affiliates, were violating exchange rules, performance bond calculations.

167.   Lazzara, LCI and ADMIS never issued a margin call violating the CEA.

168.   In further malfeasance, wrongdoing, without Kumaran's knowledge and consent, Boshnack, Rothman, and Felag were tampering with, interfering with, violating exchange rules, and in gross negligence and errors and omissions, misstating account and using unreasonable, non-exchange complaint procedure to inflate Kumaran's account – with detrimental effects.

169.   At all times, including on or around May15 2017 and May 16 2017 using interstate wires and mail communications, Lazzara persisted in the fraud, deceit and misrepresentation, to conceal Vision affiliates access and their grossly negligent, deliberate and material meddling in its competitor CTA's account, which was expressly forbidden under exchange rules, and instead fraudulently misrepresented that ADMIS had authorized an intraday credit line. The information was false.

170.   Upon belief, Boshnack, Rothman, Felag and Vision affiliates had unlawfully manipulated credit without consent or authorization, causing material harm and sabotage to a competitor Kumaran's CTA account.

171.   Lazzara intentionally, for his own self-serving benefit to partake in the fraud, materially concealed and omitted from dialog, that Vision and had fully disclosed discretionary authority on his customer and CTA's and fraudulently concealed the outsourcing of risk management policies and procedures – even when it was evident customers account were suffering financial harm.

172.   Despite the gravity and seriousness of the situation, Trey Lazzara,  using interstate wire and electronic and mail communications, intentionally, repeatedly and persistently continued the deception and fraud, knowingly misrepresented pretending to Kumaran that he was speaking to ADMIS, and instead fraudulently concealed and materially omitted that risk management services were being provided by Felag, Rothman, Boshnack and Vision affiliates.

173.   On or around May 17, 2017  Kumaran in New York, finally spoke to Dave Glancy in Chicago, IL, at ADMIS risk department. Glancy, also, by fraudulent concealment, intentionally omitted and failed to disclose that Vision affiliates had been outsourced risk.

174.   On or around June 8, 2017 Kumaran because of the gross negligence, errors and omissions began to close its account at ADMIS. At no time did it have knowledge that behind the scenes Vision were responsible for the risk management services at ADMIS.

175.   On or around June 17, 2017, Kumaran from its cellphone in New York City, New York spoke to Dave Glancy in his offices in Chicago, IL, and discussed the risk management policies on Plaintiffs accounts. Glancy fraudulently concealed and materially omitted that Vision had been delegated authority to handle margin and risk management. In fraudulent concealment Glancy stated the "IB" was unqualified to handle the account.

176.   At the time Kumaran and NRCM were still materially deceived that only IB was Lazzara and had no knowledge or awareness of Vision .

177.   Glancy knew and had actively participated in the fraudulent concealment that the account had been outsourced to Vision affiliates, but fully participated in the concealment and deception. Glancy then material representations that the fault of mishandling laid on Lazzara, as the IB, and recommended Kumaran and NRCM migrated to a new IB.

178.   On or around June 25 2019 Kumaran closed the account, citing gross negligence in the risk department and still materially unaware of Vision affiliates access to the account.

179.   On or around June 29, 2017 Kumaran and NRCM sent a letter of termination to Lazzara that they had permanently terminated their relationship with him as an Introducing Broker, citing gross negligence and mishandling of the account. At the time, Kumaran had still no knowledge of the involvement of Vision its owners, employees and affiliates.

180.   On or around June 27, 2019 Glancy had recommended Kumaran reopen the account at the NY Office of ADMIS, still fraudulently concealing the activities of Vision.

181.   On or around June 29, 2017 Kumaran met with Joseph Noce at ADMIS in New York City. Noce stated the ADMIS Privacy Policy did not permit ADMIS to share Kumaran's CTA records at all, even between ADMIS NY and ADMIS Chicago, and that ADMIS policies prohibited the distribution of trade data. At the time, Kumaran had still no knowledge of the involvement of Vision its owners, employees and affiliates.

182.   On or around September 29, 2017 Noce, an ADMIS NY employee, resent a copy of ADMIS's Privacy Policy, that he stated prohibited sharing of customer accounts. Noce stated he was not aware of any risk management services being outsourced to Vision, or permissions to share confidential records with third parties.

183.   Other ADMIS employees also stated the Privacy Policy expressly forbade the sharing of customer account information, specifically trading data, even between ADMIS location offices and no such activity was permitted under ADMIS internal policies.

184.   On or around June 30, 2017 Kumaran was still receiving erroneous billing from Lazzara, and due to high volume of trades, it was noticing discrepancies in some of the financial statements – which over the summer, once the account was closed – it began to reconcile.

## DISCOVERY OF THE FRAUD

185.   On or around August 20 2017 Kumaran through reconciliation and audit, detected that cash balances in the account ending balances did not tie out, and that unauthorized fees and payments had been made to deplete its CTA performance by over  3.4% over forty five days, to deplete its competitive valuation in direct and targeted unfair market competition.

186.   Kumaran promptly notified Lazzara who repeatedly stalled and prevaricated in response.

187.   On or around September 20, 2017 Kumaran uncovered that unauthorized access had been given to its account to third parties, Vision's owners and affiliates and started to confront Lazzara.

188.   On or around September 20, 2017, September 27, 2017 and September 29, 2017 after multiple emails, seeking explanations from her broker Lazzara, how unauthorized third parties Vision affiliates had access its accounts, and demanding to know what their financial interest was in her proprietary trading records as a CTA, Kumaran was alerted to the fraud. (**See Exhibit 5**)

189.   Lazzara on or around September 27, 2017 tried to blame others " he was following risk management procedures of ADMIS to give confidential emails related to Kumaran's trading account to Vision's affiliates' risk management procedures he had materially concealed at account opening, and were mandatory to be disclosed under NFA Rule 2-26 / CFTC 1.11, 1.55 and 33.7.

190.   On or around October 12, 2018 ADMIS,  admitted that it had shared the trading strategies of Kumaran's CTA account with its competitors Vision, its owners, employees and affiliates – in arrangement for them to provide risk management services. The risk management services performed were grossly negligence, by unqualified personnel, replete with errors and omissions, and egregious violations of the CME rules, to use non-compliant.

191.   It was apparent that Kumaran's was one of many customers and CTA's that ADMIS had been giving backdoor access to Vision, to unlawfully acquire the trading strategies and financial information of its confidential futures customers' accounts. Kumaran, a registered CTA and NFA Member had not authorized such conduct, and it was fraudulently concealed.

192.   On or around March 2018 Plaintiffs spoke with other ADMIS brokers, TJM securities, and they had not heard of any legitimate or necessary outsourcing of risk to Vision affiliates.

193.   On or around May 2018 spoke to individuals at the CFTC and CME. They were not aware of any approvals between ADMIS and Vision affiliates that permitted sharing of customer accounts. Upon information and belief, the purported unlawful, unnecessary risk management service were fraudulently concealed from the CFTC, and violated CFTC 1.11.

194.   On or around August 2019 spoke to James Koutoulas, a former NFA Board Member who also clears his company futures trading accounts through ADMIS. Koutoulas had no knowledge of any outsourcing of risk to Vision affiliates.

### DIRECT COMPETITION, USE, PROFIT AND GAIN

195.    On or around March 21 2018, after fraudulently acquiring dozens of its competitors, other CTA;s and customers, trade secrets, confidential and proprietary transaction records and trading history, an dozens of their competitors "trading strategies" in violation of the Commodities Exchange Act, and other Federal Law, Howard Rothman and John Felag formed Vision Investment Advisors.

196.  Defendants Vision Investment Advisors, Inc became registered as a CTA in direct competition with Plaintiffs and other similarly situated CTA's,

197.   Acting in conspiracy with ADMIS, and Vision, after unlawfully acquiring, dozens of their competitor CTA's trading strategies, and inner workings of their traders, transaction details, and risk management procedures, all considered trade secrets, Vision owners, employees and affiliates, then used, incorporated, profited and procured other leverage and benefit from their tin the use of their own competing operations in their provision of risk management services,  and competing trading books, in direct competition with   Plaintiffs.

198.   Upon information belief, both Felag, Rothman and Boshnack, have Power of Attorney on the Vision Investment Advisors accounts, as well as on other Vision Affiliates, including but not limited to all Vision defendants named herein, and their family office proprietary trading accounts.

199.   Vision, its owners, employees and affiliates, would improperly acquired computer access, details and inner workings of their competitors' CTAs trade secrets, actively engaged in wanton and morally reprehensible behavior to sabotage and harm their CTA's strategies, to deplete the profitability of their competitors accounts with tampering with their fees, willfully and maliciously took actions to reduce their competitors and CTA's performance record and take other deliberate action to interfere in their economic advantage, including violation exchange margin rules, and otherwise impede their ability to transact in the markets.

200.   Vision Defendants also own, operate, and receive direct financial benefits from a directly competing CTA referral business under which they funnel Assets Under Management "AUM" to a competing network of "High Ridge Futures Recommended CTA's" that also trade competing commodities options and futures trading programs, and compete for ADUM in the market.

201.   Therefore Vision are in the direct commercial business, of raising AUM, diverting AUM, allocating AUM and soliciting AUM in competition with  foregoing CTA's who's trading records and performance they wantonly depleted, and diverted trading assets away from.

202.   Malicious  activities included but not maliciously and wantonly restricting trading access, in direct unfair market competition and other unlawful margin activities, which were being performed without the CTA's authorization, knowledge, permission or consent.

203.   After the unlawful and improper acquisition of its competitor Plaintiffs trade secrets, Vision Investment Advisors, and its other owned and operated Vision affiliates, Howard Rothman Family Offices, Boshnack Family Office and other affiliates, including their own personal and proprietary trading accounts have used, incorporated, copied, and profited from the acquisition of Plaintiffs CTA's including other similarly situated CTAs trading records .

## MAIL, WIRE AND TRADE SECRET FRAUD RACKETEERING ACTIVITY

204.  As discussed above, the rogue risk management services purportedly provided by the Vision Defendants were not necessary, were unlawful, were fraudulently concealed, were performed by unqualified personnel on material deficient platforms, violated the Commodities Exchange Act and other laws, were grossly negligent, were replete with errors and omissions, were not authorized by or disclosed to the customer as required under the CEA, and were fraudulently paid for.

205.  The objective of the scheme to defraud Plaintiffs, which occurred throughout the period September 2014 until present date, was to gain unauthorized access to their competitors accounts, and collect unauthorized overcharges and  fees, disguised in overcharges such as trade processing fees and transaction fees to which the Vision defendants and beneficiaries were not entitled to.

206.  The ruse of risk management services, for which upon belief no legitimate contract existed, were not necessary and were not lawfully rendered, violated exchange rules, were grossly negligent, were replete with errors and omissions, were performed by unqualified personnel, were fraudulently concealed, were not authorized by or disclosed to the customer as required under the CEA, were fraudulently billed, and were billed at excessive and unreasonable amounts, deliberately causing depletion of CTA's performance record and marked conflicts of interest..

207.  This objective necessarily required the fraudulent disguise and inclusion of overcharges, fees, trade processing fees and transaction fees, to be deducted in cash payments from Plaintiff's accounts, to be paid across interstate wires to Vision Defendants; and the fraudulent disguise and dissemination of customers and CTA's competitive trade secrets and trading strategies in violation of 18 USC 1831 across interstate wires to Vision defendants;

208.  All documents, communications, emails, letters, correspondence, transaction records, trade secrets, trading strategies and unauthorized fees and access in connection with unnecessary, unqualified, and unlawful access to customer accounts, throughout this pleading traveled through interstate wires ,emails, telephonic communications or mail and were delivered to, acquired from or received by Plaintiffs including in the Southern District of New York.

209.  Every fraudulent statement, and unauthorized fees and statements, and unauthorized  detailed herein involved at least one (1) use of the interstate mails or wire communications, including the e-mailing of false statements and concealment of financial records and concealment of Vision's unauthorized access to Plaintiff's CTA accounts, and unauthorized deduction of fees from customers and CTA"s account..

210.  It was foreseeable to the Defendants that making false representations to Plaintiffs would trigger reliance by Plaintiffs on the false statements and concealments in furtherance of the scheme to defraud, including actually opening, maintaining and transferring funds, capital, assets, and property including intellectual property to ADMIS.

211.  Every unauthorized fee and deduction at issue, and ever improper acquisition, use and profits of its competitors trade secrets, as listed in this Complaint, where Plainitffs were induced to rely on the Defendants' false statements, were deducted or accessed from Plaintiff's commodities futures trading accounts using interstate mail and wire communications.,

212.  The fraudulent scheme detailed herein generated thousands of individual deductions and fees taken out of futures customer's accounts across interstate bank wires, and generated thousands of instances of where Defendants and their conspirators, unlawfully accessed, downloaded, copies, and acquired their competitors transaction records, financial information and trade secrets.

213.  As  detailed  herein,  the  Defendants  fraudulently  concealed  and  disguised  Visions' unauthorized access to customers and CTA's accounts and  fraudulently concealed and disguised these overcharges and fees, and using fraudulent communication, material misstatements, and omissions, that were submitted to Plaintiffs via interstate wires, email or telephonic communications related to each Plaintiff, customer or CTA discussed in this Complaint.

214. It was within the ordinary course of business for Defendants with their conspirators to fraudulently conceal, misrepresent and improperly acquire their competitor CTA's trade secrets fraudulently conceal and mispresent trade processing and transaction fees to overcharge fees, from Plaintiffs confidential accounts through interstate wires and mail and unlawfully deplete CTA's performance records in unfair competition,

215.  Moreover, the business of fraudulently gaining unauthorized electronic access to customer and CTA's financial accounts and trading records, seeking unauthorized fees and payments, and gaining an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and providing unnecessary and unqualified services, impermissible by the CEA, by ADMIS and each of the Vision Defendants and the LCI Defendants at issue herein is regularly conducted by to which each Vision defendant is not entitled and is achieved through the use of fraudulent communications sent via intestate wires and mail.

216.  In other words, discrete fraudulent misrepresentations, improper acquisition, use and profit from their competitors' CTA's trading accounts, fraudulent concealment of fees, deducting trade processing and transaction fees without customer's authorization, are instances of mail and wire fraud are a regular way of doing business for each of the defendants.

217.  The Defendants at the direction and with the knowledge and participation of their owners and managers, including Howard Rothman and Robert Boshnack, continue to overcharge fees, collect and deduct cash payments, improperly acquire their confidential trade secrets, fraudulently seeking unauthorized fees and payments, and gaining an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and harm Plaintiffs and other similarly situated .customers and CTA's.

218.  Thus, the Defendants' commission of mail and wire fraud continues.

219.  As all of the Defendants named in the conspiracy agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Plaintiffs, to access, acquire, use and profit from  their confidential trading accounts, and deduct unlawful fees not permissible under the CEA,

charging fees and performing unnecessary and unqualified services that are not permissible under the CEA, these defendants committed mail fraud, as defined in 18U.S.C. § 1341.

220.  As several of the Defendants named herein agreed that they would use (and, in fact, did use) emails and telephonic calls over interstate wires in furtherance of their scheme to defraud Plaintiffs by receiving payment for services that are not compensable under the Commodities Exchange Act, these Defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

221.  Plaintiffs reasonably relied on the fraudulent representations received from LCI Defendants and Vision Defendants listed in detail above, including but not limited  the material representations that "*John from risk*" worked at ADM, and that LCI "*works with a division of ADM*" and that "the patch has fixed the problem" indicated above and Exhibit 4.

222.  As the Defendants agreed to pursue the same criminal objective (namely, mail and wire fraud, and theft of trade secrets), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Plaintiffs' damages.

## DAMAGES

223.  Defendant has wrongfully profited from its fraudulent conduct, and been unjustly enriched, and that by reason of the foregoing, the Plaintiffs have been damaged, suffered irreparable harm and been injured in their livelihoods, financial assets, economic advantages, business and property.

224.  As a result of the Defendants fraud and other foregoing conduct alleged herein, Plaintiffs have suffered damages that includes without limitation, irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, depletion and losses in CTA's performance records, damages to their good will and other impacts to the their CTA careers, reductions to the financial trading account balances, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages.

225. Plaintiffs Kumaran, NRCM. Customers 1-100 and CTA's 1-100 have also collectively suffered damages and financial harm in unauthorized fees and deductions, estimated to exceed $50 million in overcharges, being concealed to pay Vision its owners, employees and affiliates. The

unlawful and unauthorized fees are ongoing and accumulating, causing ongoing financial damages and losses, depletion to account value and losses from Plaintiff's accounts.

226.  CTA's have also been harmed by the depletion of fair market competition, by the unlawful access to their trading  strategies by competitors Vision its owners, employees and affiliates. The wrongful conduct and misappropriation of Plaintiffs' trade secrets alleged herein will continue unless enjoined and restrained by this Court, and is causing and will continue to case great and irreparable injury to Plaintiff's livelihoods and business, and is causing and has caused Vision its owners, employees and affiliates to have improper advantages, positions, and rights in the marketplace to Plainitffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiffs' trade secrets by Vision its owners, employees and affiliates, as well as ongoing depletion of performance records, and deduction of fees,  continues to irreparably harm to Plaintiffs confidential futures trading accounts.

227.  Furthermore, the extensive, and far reaching pattern of fraudulent conduct by Defendants evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

## CAUSES OF ACTION

### COUNT I – FRAUD
**Against Trey Lazzara, Lazzara Consulting, Inc, Julie Villa,  John Felag, Howard Rothman, Robert Boshnack. High Ridge Futures, High Ridge Holding Corporation, Vision Investment Advisors, Inc, Vision Financial Markets,**

228.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

229.  Count I - Defendants had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

230.  Count I - Defendants and its agents, servants, employees had an affirmative duty to abide by the CEA, abide by the compliance rules and laws of Introducing Brokers, NFA Members, and their

disclosure laws, and abide by the compliance NFA rules, regulations and requirements including the anti-fraud provisions.

231.  Count I – Defendants representations were false or required disclosure of additional facts to render the information furnished not misleading, including as required. Specifically and without limitation of ADMIS's obligations and material disclosure requirements, Count I - Defendants,  are obligated to the disclosure requirements under the CEA.

232.  Further, without limitation Count I - Defendants are obligated under NFA Rule 2-4 9061 to not disseminate CTA"s confidential and trade secret records,  which states expressly that it is a NFA Compliance violation for NFA Members Vision owners, employees, affiliates to obtain a CTA's trading records without their permission; and to abide by Federal Laws, under the Defend Trade Secrets Act;

233.  The misrepresentations, fraudulent concealments and omissions,  were intentionally made by Count I - Defendants,  in furtherance of their scheme to defraud Plaintiffs by inducing them to open accounts at ADMIS, and then engaging in the scheme to disseminate their accounts for profit, to generate profits and income to Vision, and to engage in direct unfair market competition, by disseminating CTA"s accounts to other NFA members, and CTA's Vision, expressly prohibited under fair market place laws and other market place misconduct to create an unfair advantage to Defendants.

234.  Count I - Defendants, misrepresentations were known to be false and were made for the purpose of fraudulently inducing Plaintiffs to open accounts, entrust funds, property and business to ADMIS under false pretenses, to continue to maintain accounts at ADMIS,  and to participate in the unlawful and fraudulent scheme to deduct unauthorized fees that are not compensable under the Commodities Exchange Act,  and to unlawfully disseminate of customer and CTA"s trade secrets and trading strategies, which is not permitted under the CEA and/or the Defend Trade Secrets Act; and to deplete the fair market competition and economic advantage of customers and CTA's, and Plaintiffs, as alleged herein.

235.  The misrepresentations of fact made by the Count I - Defendants,  include, but are not limited to, those material misrepresentations discussed in detail and exemplified herein.

236.  The scheme to defraud perpetrated by Defendant and its co-conspirators, was dependent upon a succession of material misrepresentations of fact, fraudulently concealments and omissions, by Count I - Defendants, as outlined herein by which among other concealments, Count I - Defendants, materially concealed, that substantial portion of ADMIS's futures clearing business, instead of being guaranteed by Archer Daniel Midlands, or ADMIS' own credit worthiness, instead is reliant upon significant personal financial guarantees, personal credit lines obtained from the owners of the disbarred Vision Financial Markets, Howard Rothman, Robert Boshnack and Vision affiliates, and that customer and CTA accounts, were being disseminated without consent;

237.  The fraudulent concealment and omissions, were material and directly impacted the customer and CTA's, and violate the material obligations of disclosure of the IB and NFA rules,  because in exchange for the secret financial guarantees from Vision's owners and affiliates, in express violation of the CEA, the Defend Trade Secrets Act, and other Federal laws, and its fraudulently without the customer and CTA's knowledge, consent, permission and authorization ADMIS are

    (a)      unlawfully distributing customer and CTA' confidential trading secrets and futures accounts to Vision, who then set up a competing CTA, in direct unfair market competitions in violation of Federal law, privacy laws, and the Defend Trade Secrets Act;

    (b)      unlawfully overcharging customers and CTA"s fees between 0.30 cents and $6.00 for compensation to unauthorized third parties and Vision amounting to over $10 million dollars a year, without the customers consent;

    (c)      unlawfully permitting Vision to tamper with, extend and manipulate margin controls, liquidate accounts, place trades for customers, and engage in other manipulation of their competitors accounts in direct unfair market competition [14];

    (d)       improperly acquire their competitors trade secrets, for use, profit, gain, engage in economic sabotage and direct unfair competition;

    (e)      other misconduct alleged herein,

---

[14] CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S C§ 78g (2) (A)(B), NFA 2-26 17CFR§1.57 (c.) §1.55 Part (k);

so that Defendant and its co-conspirators, can fraudulently secure business that violates the CEA, for their profit, gain and financial benefit;

238.  Plaintiffs reasonably relied upon such material misrepresentations, fraudulent concealments and omissions to their detriment in agreeing to open accounts at ADMIS, and transferring valuable money, property, assets, confidential information and  trade secrets to ADMIS therein.

239.  As a direct and proximate result of the defendants' fraudulent representations and acts, Plaintiffs have been damaged in its business and property as described herein. Defendants have wrongfully profited, received concrete benefits, from their willful, knowing participation fraud, with wanton disregard for their customers and CTA's rights, and have caused Plaintiffs substantial damages and irreparable harm.

240.  Count I - Defendants, jointly and  severally, have  wrongfully profited from  its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

241.  Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT II – FRAUDULENT INDUCEMENT OF CONTRACT
**Against Trey Lazzara, Lazzara Consulting and Julie Villa (LCI Defendants)**

242.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

243.   Count II - Defendants falsely made material representations to Plaintiffs. commencing in or around December 2016  at specific dates, times and places as alleged herein, and thereafter that Count II Defendants had a duty and obligation to comply with the sales and solicitations requirements of introducing brokers under the Commodities Exchange Act and other duties of honesty

244.   Those obligations and duties include but are not limited to

a.   NFA 2-26 including without limitation CFTC 1.11, CFTC 1.55 and CFTC 1.57 which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account[15];

b.   NFA 2-4 Int Not 9061 which is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission;

c.   NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which required that Lazzara disclose all the costs and fees, transaction fees and trade processing fees (being deducted from Plaintiff's accounts to pay Vision affiliates) *prior* to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement

d.   NFA 2-2 which makes it an NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or customer; the unlawful violation of the anti-fraud provisions of the CEA 7 USC 6(b)(2);

e.   NFA 2-29 which prohibits the fraudulent sales and telephonic sales and marketing communications by a network of Trey Lazzara and other Vision IB's; and NFA Bylaw 801 which prohibited solicitations from unregistered AP's Julie Villa

f.   NFA Margin Handbook and NFA Financial Handbook Section 7, which mandated that Lazzara and ADMIS, issue margin calls directly to customers, and not to Robert Boshnack, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

g.   NFA 2-26 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV) and which prohibited Vision, its owners, affiliates and employees from directly  or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Kumaran's account, as well as power of attorney to handle margin calls.

h.   the unlawful and unauthorized dissemination of customers and CTA's personal financial data, social security numbers, net worth, financial balances, names, addresses, telephone numbers and other personal and confidential information in violation of CEA;

i.   participating in the scheme with ADMIS, Vision and Vision IB"s to a participate in direct unfair market competition, and a deplete innovation in the market from CTA's, in violation of the CEA. 7 U.S.C. § 6b (2)

245.   LCI Defendants, individually and jointly, made material misrepresentations, fraudulently

concealed and materially omitted in their sales, promotions, and solicitations of the accounts at

ADIMS, as detailed in Exhibit 1 and Exhibit 2,  including but not limited to

---

[15] CFTC 1.55 (k) ..disclosures about risk policies *prior* to a customer entrusting funds to an FCM were prerequisite and CFTC 1.55.(l) .. expanding upon such information as necessary to keep such disclosure from being misleading whether through omission or otherwise

a.     that ADMIS had unlawfully outsourced the material handling of margin calls and risk management procedures to Vision, its owners, employees and affiliates, including impermissible delegations of discretion and authority to liquidate customer accounts; place trades on behalf of customers, and extend margin and credit to the customer, without power of attorney all in violation of the CEA;

b.     that the rogue risk management services purportedly provided by the Vision Defendants were not necessary, were unlawful, were fraudulently concealed, were performed by unqualified personnel on material deficient platforms, violated the Commodities Exchange Act and other laws, were grossly negligent, were replete with errors and omissions, were not authorized by or disclosed to the customer as required under the CEA, and were fraudulently paid for;

c.     that the foregoing unnecessary, unlawful r risk management services were  conducted on materially deficient electronic platforms, using decades old eighties technologies, that did not possess technologies to handle all strikes in options trading,  were materially unable to monitor intraday valuation MTM and margin in violation of CME Rules, and were using a non-exchange compliant form of "margin allowances' which expressly violated the margin criteria under CME 930, 980 and 982, and expressly impaired trading to deplete fair market competition and concealment Vision's employees, owners and affiliates.

d.     that their confidential and proprietary information including trading strategies, account information, financial information, account valances, and all real-time details of their account information would be disseminated across interstate lines to Vision;

e.     that unauthorized fees would be deducted from their accounts to pay Vision;

246.   Reliant on the fraudulent representations, and deceived by the material omissions and fraudulent concealments, Plaintiffs were induced to open futures trading accounts at ADMIS, and entrusted funds, business, property, intellectual property, capital and money with ADMIS. Plaintiffs reasonably relied on LCI Defendants fraudulent representations in deciding entrust funds to open accounts at ADMIS.

247.   Count II - Defendants however knew their representations were false and they had been engaging in the fraudulent and illegal scheme since September 2014.

248.   The foregoing misrepresentations and omissions were material, because if Plaintiffs had known the foregoing misrepresentations were not true, or if the concealments were properly disclosed, Plaintiffs would not have chosen to open futures accounts at ADMIS, and do business with ADMIS, and would not opened accounts, and would not suffered the significant harm incurred today.

249.   Count II - Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

250.   Count II - Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT III – AIDING AND ABETTING IN FRAUD
### Against all Defendants

251.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

252.   Defendants, individually and collectively, had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

253.   In the alternative to Count I, Plaintiffs plead Aiding and Abetting in Fraud

254.   Defendants had an affirmative and statutory duty to enforce the CEA, enforce rules and laws, and enforce compliance NFA bylaws, rules, regulations and requirements including the anti-fraud provisions. Defendants in bad faith, willfully failed to enforce the CEA, NFA rules and bylaws, and Federal laws and therefore provided substantial assistance in aiding and abetting in the fraud, as listed supra.

255.   Defendants have wrongfully profited, received concrete benefits, from their aiding and abetting in fraud, and took substantive actions to enable the fraud to perpetuate and have caused Plaintiffs substantial damages and irreparable harm.

256.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Paragraphs 209-212  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein;

257.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT IV - CIVIL CONSPIRACY

258.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

259.   Defendants entered into an agreement with ADMIS, Vision employees, owners and affiliates, and Vision IB's and key NFA Insiders, to defraud dozens of customers and CTA's opening accounts at ADMIS engage in intentional violations of the CEA and Federal Law to (a) distribute customer and CTA' confidential trading secrets and futures accounts to Vision; (b) overcharge fees between 0.30 cents and $6.00 for compensation to unauthorized third parties; and (c) other misconduct alleged herein, so that Defendants and ADMIS could procure financial credit lines and guarantees from Vision's owners and support the futures industry; and operate an enterprise that violates the CEA, for their profit, gain and financial benefit; ("Agreement to Defraud").

260.   Defendants, individually and jointly acted in furtherance of their Agreement to Defraud,  by, among other things, coordinating: (i) failing to audit Vision IB's in accordance with the minimum frequency requirements ; (ii) covering up and failure to enforce NFA compliance laws, as stated above; and (iii) using the NFA Arbitration Forum, to cover-up fraud, and not enforce fair, expeditious and equitable procedures and justice, but a mechanism where the NFA could control,

impede, obstruct and prejudice Plaintiff's rights, and procure an outcome to protect NFA and its conspirators, in the Agreement to Defraud.

261.   Defendants intentionally performed the actions set forth in the paragraphs  above.

262.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein;

263.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

COUNT V– CIVIL RICO - § 1962(c).

264.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

265.   Over a pattern of continuous conduct commencing in or around September 2014 until present date, Defendants, each individually playing a role, engaged in a scheme with ADM Investors Services, Vision's owners, employees and affiliates and a network of IB's from Vision, and key insiders at the National Futures Association, Tom Kadlec, and the NFA, formed an association-in-fact enterprise (the "Enterprise"), in exchange for financial benefits to Defendants, using predicate acts of wire fraud, mail fraud and fraud to steal, misappropriate and use Plaintiffs trade secrets under 18 USC 1831,  and engage in  money laundering to defraud new commodities futures customers and CTA, for their profit, gain and financial benefit.

266.   At all times relevant herein, the Enterprise engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

267.   The scheme involves using interstate wire and mail communications, and fraud and deceptive sales, to fraudulently  induced  new customers, CTA's start-ups including Plaintiff, to open

commodities futures trading accounts at ADMIS, whereby, in violation of the law, while materially concealed, that Vision, its owners, affiliates, employees would (a) gain fully disclosed access to their accounts and trade secrets in violation of 18 USC 1831  (b) would unlawfully deduct cash payments out of their accounts across interstate lines to make payments to Vision and (c)

268.   In furtherance of the Enterprise, the co-conspirators intended to and knowingly stole and, without Plaintiff's authorization, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Plaintiffs  trade secrets.

269.   The co-conspirators also received, acquired, or possessed Plaintiffs trade secrets, knowing that they had been stolen, obtained, or converted without Plaintiffs authorization.

270.   The co-conspirators intentionally engaged in these acts to benefit Defendants, with the knowledge or intent that these acts would injure Plaintiffs.  The Defendants each agreed to further, facilitate, support, and operate the Enterprise. As such, the Defendants conspired to violate 18 U.S.C. § 1962(c) .

271.   The Enterprise, fraudulent sales and telephonic solicitations to open commodities trading account at ADM Investor Services and disguise that (a) fees and overcharges would be funneled across interstate lines to make personal compensation to Vision's Defendants and others in the Enterprise (b) CTA's trading strategies and trade secrets, would be unlawful dissemination across interstate lines and improperly acquired by Vision Defendants and (c) and each of the Defendants individually and jointly permitted the Enterprise to operate, by their direct participation in the scheme to intentionally fail to enforce the CEA and NFA rules that prohibit the conduct, as alleged in Paragraphs above and as otherwise herein.

272.   Defendants benefited from its employees' and agents' racketeering activities, and the racketeering activities of Lazzara, Villa, Felag, Rothman and Boshnack and others were committed within the scope of their employment while at LCI and/or Vision affiliates.

273.   Defendants directly acquired financial benefit from the scheme. The predicate RICO acts set forth herein were carried out on a continued basis for more than a five period, were related and similar and were committed as part of the ongoing scheme of Defendants, one or more of the Vision

IB's  to fraudulently induce accounts to ADMIS and then unlawfully disseminate CTA's strategies to Vision Defendants, and unlawfully deduct cash and transfer it to Vision Defendants, and, if not stopped, such acts will continue into the future;

274.   Upon information and belief, this pattern of activity poses a specific threat of repetition extending indefinitely into the future, and continued to harm to the present day;

275.   The Defendants fraudulently to collect unauthorized fees and deductions, estimated to be over than $10 million dollars a year, in violation of the Defend Trade Secrets Act, the Commodities Exchange Act, Federal and State law, and transfer those funds, under false pretenses, and without the customer and CTA's knowledge and approval to Vision, its owners, affiliates and employees.

276.   The scheme therefore also underpins unlawfully money laundering Plaintiffs cash from its customers futures accounts, across interstate commerce, which directly depleted the profits of their accounts and the performance record of their trading activities, as well as stole the trading strategies. Defendants knew that the transaction involved such proceeds would be wired across interstate to Vision owners and affiliates and made persistent and repeated attempts to fraudulently conceal. Vision IB and ADMIS, enabled by Defendants, intended to promote the carrying on of the specified unlawful activity and knew the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds -  namely Rothman and Boshnack.

277.   Plaintiffs have been damaged as a direct and proximate result of a violation of the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968) ("RICO") and by reason of this conspiratorial conduct whereas Plaintiffs have been induced to open accounts at ADMIS, and unwittingly contribute and disclose trades secrets, assets, capital, property, goodwill, and irreparable loss of competitive trade secrets to Vision as a result of Defendants' unlawful conduct described herein.

278.   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(c) by the co-conspirators, Defendants have wrongfully profited from their civil conspiracy and have caused Plaintiffs economic damages and irreparable harm, including, but not limited to, injuries in the Southern District of New York in an amount to be proven at trial.

279.   The actions of the co-conspirators constitute racketeering activities in violation of 18 U.S.C § 1832. This pattern of activity poses a threat of continuing because Defendants are continuing to proceed with the fraudulent activity, overcharging of fees, dissemination of customers confidential financial trading accounts, dissemination of trade secrets, and other unlawful conduct;

280.   The racketeering activities and violations of 18 U.S.C. §1962(c) has caused and will continue to cause Plaintiffs irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of the Plaintiffs trade secrets is necessary to provide Plaintiffs with complete relief.

281.   If the co-conspirators were permitted to continue to engage in their racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and all future Plaintiffs will and are being irreparably harmed and the economic damages to Plaintiffs will be difficult to quantify. The aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiffs and with wanton disregard for their rights;

282.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein

283.   Defendants are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from each treble damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

284.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT VI – CIVIL RICO -  U.S.C. § 1962(d)

285.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

286.   The Co-Conspirators have intentionally conspired and agreed to directly and indirectly participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C § 1832, as described in Count XIII

287.   The Co-Conspirators knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, as described in Count XIII.

288.   The actions of the Co-Conspirators constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

289.   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by the Co-Conspirators, Plaintiffs have suffered economic damages throughout the world, but not limited to, injuries in the Southern District of New York; in an amount to be proven at trial.

290.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein

291.   The aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiffs and wanton disregard for their rights, entitling Plaintiffs to treble damages, attorneys' fees, and costs.

292.   Defendants are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from each three times the damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

293.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT VII – MISAPPROPRIATION OF TRADE SECRETS  (Defend Trade Secrets Act)

294.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

295.   Plaintiff Kumaran's and other CTA's transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage are trade secrets are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the information.  Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information.

296.   Plaintiffs took and takes reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

297.   Defendants misappropriated trade secrets by deliberate actions which include but not limited to: (1) acquisition of Plaintiff's trade secrets using improper means, including by fraudulent inducement of trading account, violations of duties and obligations under the CEA, fraudulent sales and telephone solicitation, and fraudulent concealment of Vision's access to CTA's strategies; (2) Defendants breach of the CEA, NFA Rules, CFTC Rules, compliance duties and Federal laws and confidential relationship and obligations to maintain the secrecy and restrictive covenants of customer trade secrets; (3) ongoing use and profit by Defendants, in interstate commerce. in direct competition and to cause economic harm,  and their conspirators own economic benefit without the express or implied consent of Plaintiffs; all in violation of the Defend Trade Secrets Act  "DTSA".

298.   Defendants have wrongfully profited from their misappropriation and have caused Plaintiff Kumaran and CTA's damages and irreparable harm. in loss of their confidential and trade secrets to

their competitors, and depletion of their competitive advantage, and reduction in their performance track record by Vision, its affiliates including Vision Investment Advisors and others.

299.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

300.   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and it could cause Vision Defendants to have improper advantages, positions, and rights in the marketplace to Plainitffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Vision Defendants would irreparably harm to Plaintiffs.

301.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT VIII – MISAPPROPRIATION OF TRADE SECRET MISAPPROPRIATION     NEW YORK LAW
**Against all Defendants**

302.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

303.   Plaintiffs trade secrets, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage are trade secrets,  that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

304.   Plaintiff has taken reasonable measures to protect the secrecy of Plaintiffs trade secrets, and includes by reference Paragraphs 294-299 above,

305.   However, the co-conspirators intended to and knowingly stole and, without authorization, acquired, used, profited from, studied, incorporate, referred to as guidance, disclosed, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, conveyed or otherwise obtain commercial benefits from Plaintiffs' unlawfully acquired trade secrets.

306.   The co-conspirators acquired, used or disclosed Plaintiffs' trade secrets, knowing that they have been stolen, obtained, or converted without Plaintiff's authorization. The co-conspirators intentionally engaged in these acts to benefit Vision Defendants with the knowledge or intent that these acts would injure Plaintiffs.

307.   As a direct and proximate result of violations of New York law, by the co- conspirators, Plaintiff has suffered economic damages both domestically and abroad, including, but not limited to, in the Southern District of New York in an amount to be proven at trial but exceeding $75,000.

308.    The aforementioned acts of the co-conspirators were done willfully, with malice toward Plaintiffs. Based on the willful and intentional misappropriation of Plaintiffs' trade secrets : (1) Defendants should be enjoined from any further use and/or disclosure of Plaintiffs' trade secrets until such time that no further commercial advantage that would be derived from the misappropriation of Plaintiff's trade secrets; (2) Plaintiffs should be awarded damages including actual losses and a disgorgement of unjust enrichment caused by the misappropriation ; (3) an equitable accounting  for all profits or benefits arising out of such breach (4) exemplary damages including  but  not  limited to all special, indirect, punitive, consequential or other damages; and (5) all other remedies in equity and law, including recovery of its costs and legal fees under New York law.

309.   As a result of defendants' misappropriation, Plaintiffs have suffered actual damages and Defendants have been unjustly enriched.

310.   Defendants have wrongfully profited from their misappropriation and have caused Plaintiff Kumaran and CTA's damages and irreparable harm. in loss of their confidential and trade secrets to their competitors, and depletion of their competitive advantage, and reduction in their performance track record by Vision, and affiliates Vision Investment Advisors.

311.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

312.   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and it could cause Vision Defendants to have improper advantages, positions, and rights in the marketplace to Plainitffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Vision Defendants would irreparably harm to Plaintiffs.

313.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

COUNT IX – AIDING AND ABETTING IN MISAPPROPRIATION
**Against all Defendants**

314.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

315.   In the alternative  to the Count VII and Count VIII, Plaintiffs pleads aiding and abetting of misappropriation.

316.   For the reasons included by reference in Paragraphs 275-280 Plaintiffs' confidential information and trade secrets were misappropriated by Co-Conspirators ADMIS, Vision, Vision IB's, across interstate lines to Vision, its owners, employees, and affiliates in Stamford, CT

317.   Defendants had direct, actual and constructive knowledge of the misappropriation, as evidenced at length in this Complaint.

318.   Defendants had an affirmative duty to enforce NFA 2-4 9061 to abide by the  rules and laws the  prohibit  a  CTA's  trading  record  being  supplied  to  another  NFA  member  without  their permission.

319.   Defendants knowingly assisted in participating in the fraudulent scheme, concealing their involvement, making misrepresentations, fraudulent concealments and omissions as documented herein, so that Vision  Defendants could improperly acquire, and misappropriate dozen of customer and CTA's competitive trading strategies in direct unfair market competition, for their use and profit in violation of DTSA.

320.   Defendants have all,  wrongfully profited from misappropriation and have caused Plaintiff damages and irreparable harm . As a result of Defendants bad faith failure to abide by it duties, and failure  to  abide  by  the  CEA,  and  aiding  and  abetting  in  misappropriation,  Kumaran  and  other customers and CTA's have suffered irreparable harm in loss of their confidential and trade secrets, to their competitors, as well as other significant damages, as alleged herein;

321.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein;

322.   Defendants  conduct  was  intentional,  fraudulent,  willfully  and  wantonly  reckless,  and malicious which justifies an award of punitive damages.

### COUNT X – UNFAIR COMPETITION / MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
**Against Vision Defendants**

323.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

324.   Vision Defendants are direct competitors in of Plaintiff and other similarly situated CTA's in the  provision  of  numerous  services  and  business,  both  as  CTA's  with  economic  interests  in

performance of trading strategies, in the commodities futures markets and second in the provision of risk management services.

325.   Vision Defendants knew that Plaintiff Kumaran and its business had direct competitive interests, conflicts of interest in both risk management and commodities trading, and Vision Defendants intentionally, and unlawfully aggressively pursued wrongful access to Kumaran's CTA trading account, emails, and other confidential information.

326.   Using fraudulent misrepresentation, deceit and other morally reprehensible conduct, Vision Defendants' wrongfully acquired Plaintiff's competitive confidential information that was borne from significant cost, labor, expenditure of money, time, expense and decades of professional experience.  Vision Defendants did not pay for, did not earn and did not pay equitable restitution or compensation to acquire such detailed knowledge of their competitors.

327.   Specifically,  their use and competition includes but not limited to Vision defendants, use in the provision of purported risk management services, and their improperly acquired, use and incorporation of Plaintiff confidential information for use as a third-party testing facility services, to benchmark, validate, test the grossly negligent, errors and omissions in their competing services.

328.   Additionally Vision Defendants, have improperly acquired detailed knowledge of their competitors confidential risk and trading strategies, which they in whole or in part, then used, incorporate, copies, infringed, included, and acquired in their own proprietary and other direct competing trading activities, including

329.   Also as indicated herein, Vision Defendants and their co-conspirators, engaged in willful and malicious acts to harm their competitors, actively monitoring their competitors trading performance, and intentionally, with direct conflicts of interest, sabotaging and destabilize their accounts, and reducing their performance record, adding on new fees as indicated on May 2, 2017.

330.   Their malicious intent to harm their competitors, and intentionally deceive CTA's they intentionally schemed, to lower their overcharges to 0.30cents a trade ,so the, CTA's that are price sensitive, would not "notice the overcharges" and then deceitfully, in express violation of the fair

market exchange rules, the CEA, and NFA Rule 2-4, acquired detailed, real-time, line-by-line access to their competitors trading account.

331.   Defendants have misappropriated their competitors' Plaintiff's confidential information, skills, labor  for their own profit, gain and benefit and have been unjustly enriched.

332.   Their careful planning was  with scienter and malicious intent to includes conceiving plans to defraud CTA's in particular, with lower fees that would go "undetected" so they could access their accounts.

333.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein

334.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XI – UNJUST ENRICHMENT
### Against Vision Defendants

335.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

336.   By reason of their wrongdoing, Vision Defendants  have been unjustly enriched, in that they have, directly and/or indirectly, (a) received moneys estimated to be not less than $50 million dollars from Plaintiffs and (b) improperly acquired, used and incorporated valuable trade secrets and confidential information, including but not limited to trade secrets and confidential information, from Plaintiffs, for use and profit in their trading and risk management operations, of Vision Defendants affiliates that are currently trading and using today, in an amount to be proven at trial but estimated to be not less than $1mm and (c) improperly acquired Assets Under Management

("AUM") from the sabotage and economic interference in their competitor CTA's performance records.

337.   Plaintiffs trade processing fees, transaction fees and other overpayments and unauthorized fess and payments which were deducted from their commodities trading accounts constitute a benefit which the Count XI - Vision Defendants aggressively sought and voluntarily accepted.

338.   The Count XI – Vision Defendants (i) wrongfully obtained fees and collected moneys from Plaintiffs (ii) wrongfully obtained trading profits and risk management savings and other financial benefits to their trading operations (iii) wrongfully acquired AUM and depleted performance of their competitors through the fraudulent scheme detailed herein and (iv) unfairly obtained a competitive advantage in the CTA market place, to the detriment of the victims of the fraud, including ability to diminish the performance of their competitors, and positional advantages which are unjust by having improperly acquired their competitors trade secrets;

339.   The Count XI - Vision Defendants have been unjustly enriched by receipt of these wrongfully obtained fees, wrongfully obtained trading profits and financial benefits, and wrongfully acquired AUM,  from Plaintiffs.

340.   The Count XI - Vision Defendants' retention of these payments and profits and other financial benefits would violate fundamental principles of justice, equity, and good conscience. that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

341.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

342.   Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XII – INTERFERENCE IN ECONOMIC ADVANTAGE
### Against All Defendants

343.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

344.   Plaintiffs Kumaran and CTAs  had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world and/or careers as CTA's.

345.   Defendants were aware that Plaintiff Kumaran and CTA's had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world.

346.   Count XII - Defendants actions have prevented, and obstructed and otherwise irreparable harmed Plaintiff CTA's and Kumaran from fully maximizing its economic advantage as a CTA.

347.   Count XII - Defendants have wrongfully profited from their interference with economic advantage and have caused Plaintiff damages and irreparable harm as a result of Defendants interference with Plaintiff CTA and Kumaran's economic advantage;

348.   Count XII - Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

349.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.


## COUNT XIII – TORTIOUS INTERFERENCE IN CONTRACT
### Against John Felag, Howard Rothman, Robert Boshnack, High Ridge Futures, High Ridge Holding Company, LLC, Vision Investment Advisors, Vision Financial Markets

350.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

351.   Plaintiffs pleads this cause in the alternative to Recission of Contract with ADMIS.

352.   Plaintiffs Kumaran and NRCM and other similar situated customers and CTA's had valid and enforceable agreement with ADMIS, that required the parties to abide by the laws.

353.   Count XIII – Defendants were aware of and had direct knowledge  the agreements between Plaintiffs and ADMIS.

354.   Count XIII – Defendants, willfully and in bad faith, initiated and procured breaches of the agreements and engaged in illegal activities, to materially interfere with Plaintiffs provisions under the agreements and cause material breaches under the agreements, to materially impair their rights and provisions of benefits under the agreements.

355.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

356.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT XIV– BREACH OF GOOD FAITH AND IMPLIED COVENANT
**Against all Trey Lazzara, Lazzara Consulting, Inc, Julie Villa, John Felag, High Ridge Futures, Robert Boshnack, Howard Rothman, Vision Investment Advisors**

357.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

358.   Count XIV - Defendants had a duty to act in good faith and in fair dealing, and a duty to apply with applicable laws, rules and regulations, and to conduct its operations

359.   Plaintiff made good faith attempts to reach out to Count XIII – Defendants on numerous times before, during and after the trading and made repeated requests to understand and request information about the risk management policies and procedures.

360.  At all times, Count XIV - Defendants acted with fraud and deceit, made material representations, obscured, obfuscated, avoided, and deliberately withheld information, even at material times of financial implication to Plaintiff, and in bad faith, fraudulently concealed that risk management policies and procedures were outsources to Vision, its employees, owners and affiliates, and engaged in other dishonorable conduct alleged herein.

361.  Count XIV - Defendant's conduct was bad faith, and violated the principles of just and equitable trade including but not limited to that fraud in Exhibit 1 and 2 incorporated herein

362.  Count XIV - Defendants acted with bad faith and with deliberate intent to circumvent their independent obligations under the CEA, as registered Introducing Brokers, or NFA Members, to (i) deprive and cause irreparable harm to their loss of trade secrets and economic commercial advantage (ii) deprive and/orr significantly reduce Plaintiffs' performance record and compensations from their trading activities and (iii) and bonuses and other deprivation of commercial benefits that were relied upon as consideration of the bargain.

363.  Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

364.  Count XIV Defendants' conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.


### COUNT XV– NEGLIGENT MISREPRESENTATION / BREACH OF DUTY OF CARE
Against Trey Lazzara and LCI

365.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

366.  Over the period of time December 16 2016 until around June 29, 2017, Trey Lazzara and LCI, had superior control and information on information related to Kumaran and NRCM's futures

account at ADMIS as the sole Introducing Broker, and were solely responsible for day-to-day communications and the conveyance of accurate and honest information related to Kumaran and NRCM's trading accounts.

367.   Lazzara and LCI had a duty of care were in the business of supplying information and had a duty to provide and communicate accurate and honest information, and a duty to avoid negligently conveying false information.

368.   Plaintiff placed trust, confidence and reliance on the misstatements and misrepresentations made herein. Plaintiffs, reasonably relied upon the misstatements, omissions and fraudulent representations, that caused them to open, and continue to maintain and open commodities futures accounts at ADMIS.

369.   As indicated herein, Lazzara, and LCI, repeatedly and wantonly engaged in a continuous pattern of fraud, deception and making material misrepresentations to Plaintiffs, negligently and fraudulently conveyed inaccurate information about the risk management policies and procedures, and the margin handling at ADMIS, in express breach of their independent duties of care, and their independent duties as an Independent Broker, under rules regulations and laws of the CEA.

370.   Those fraudulent and negligent misrepresentations, include but not limited to those in listed in detail in Exhibit 4 and otherwise herein.

371.   As a direct and proximate case of Lazarra and LCI's fraudulent misrepresentations and breaches of his duties, Plaintiffs would not have been harmed as indicated herein and Plaintiffs Kumaran and NRCM would not have opened futures accounts at ADMIS, and/or would have closed their accounts immediately upon uncovering the truth.

372.   Lazzara and LCI, acted with scienter and intention to deceive, provide false representations and breached their independent duties to Kumaran, NRCM and similarly situated customers and CTA's.

373.   Defendants, jointly and severally,  have wrongfully profited from their fraudulent conduct and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 222-225  and

repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 226 and repeated herein.

374.  Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and respectfully requests that the Court enter judgment against Defendant as follows:

a.    Damages in the form of disgorgement of all profits gained by each Defendants from the fraudulent conduct from the accounts fraudulently induced hereunder;

b.    Disgorgement of all fees and profits unlawfully gained from the activity, estimated to be not less than $50 million dollars to be repaid to each any every Customer and CTA harmed;

c.    Damages for the misappropriation of trade secrets, restitution, unjust enrichment, and disgorgement of profits from Defendant, its agents, servants, employees and introducing brokers, resulting from the fraudulent scheme, and including misappropriation of Plaintiff's trade secrets;

d.    Entry of an order that restrains and preliminarily enjoins, and a Final Order that permanently enjoins, Defendants and their agents, servants, employees, introducing brokers, service providers, attorneys, and all persons acting in active concert or participation with them, from the unauthorized acquisition, disclosure, use, duplication, or distribution of the Plaintiffs' trade secrets;

e.     Damages calculated as by loss of property,  assets, livelihood and liberty, including loss of businesses, loss of CTA revenue, and intellectual property, in an amount to be determined at trial;

f.    Damages in the form of loss of capital, loss of income, loss of economic advantage, interruptions to business, costs of development, economic interruption, economic interference,

disruption and delays, royalties, irreparable losses for trade secrets in an amount to be determined at trial;

g.     Damages in the amount of all reimbursement of all financial losses and reductions of economic advantage, for all commodities trading accounts involved in the scheme;

h.     Exemplary damages including   but   not   limited to all special, indirect, punitive, consequential or other damages;

i.     Treble damages as provided in 18 U.S.C. §§ 1964(c) and 1964(d);

j.     Attorney Fees, Costs and Expenses of this action;

k.     Post and Pre Judgment Interest;

l.     All other relief, remedies and rights available in law and equity as this Honorable Court deems just and proper;

PLAINTIFF DEMANDS TRIAL BY JURY

In accordance with ECF Rule Addendum  Dated April 1, 2020 and Covid 19, this Pleading is signed and filed electronically on May 18, 2020

Electronically Signed

*Samantha Sivakumaran*

//S//Samantha Siva Kumaran

Dated: New York, New York

May 18, 2020.