**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Samantha Siva Kumaran et al.,**

**Plaintiffs,**

**-against-**

**Vision Financial Markets, LLC et al.,**

**Defendants.**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/4/2022_

**20-cv-03871 (GHW) (SDA)**

**CORRECTED OPINION AND ORDER AND**
**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE:**

## INTRODUCTION

Before the Court are: (1) a motion by Vision Financial Markets, LLC ("VFM"); Howard Rothman ("Rothman"); Robert Boshnack ("Boshnack"); High Ridge Holding Corporation, LLC ("HRHC"); High Ridge Futures, LLC ("High Ridge"); H. Rothman Family, LLC; Boshnack Family, LLC; Vision Brokerage Services, LLC ("VBS"); John Felag ("Felag"); Vision Investment Advisors, LLC ("VIA"); Lazzara Consulting, Inc. ("LCI"); and Gerard Stephen Lazzara ("Lazzara") (collectively, the "Vision Defendants") to compel arbitration in part and dismiss in part the claims asserted by Plaintiffs in the Second Amended Complaint ("SAC"), and (2) a motion by *pro se* defendant Julie Villa ("Villa," and together with the Vision Defendants, the "Defendants") to dismiss the claims brought against her. (Vision Defs.' Mot. to Dismiss, ECF No. 101; Villa Mot. to Dismiss, ECF No. 98.)

For the reasons set forth below, it is hereby Ordered that the partial motion to compel arbitration is GRANTED and this action is STAYED with respect claims by Plaintiffs Nefertiti Risk Capital Management, LLC ("NRCM") and Nefertiti Asset Management, LLC ("NAM") against

Defendants High Ridge, Rothman, Boshnack, Felag, LCI, Lazzara and VIA. In addition, I respectfully recommend that the motions to dismiss be GRANTED IN PART and DENIED IN PART, such that the Court dismiss the non-arbitrable federal claims; decline to exercise supplemental jurisdiction over the non-arbitrable state law claims; and grant leave to amend or, in the alternative, that the remaining claims be stayed pending the completion of arbitration.

## FACTUAL BACKGROUND[1]

VFM was a Futures Commission Merchant ("FCM")[2] registered with the National Futures Association ("NFA")[3] until June 2014. (SAC, ECF No. 89, ¶¶ 42, 89.) VFM was owned by Boshnack and Rothman. (SAC ¶ 90.) Felag was the risk manager for VFM. (SAC ¶ 45.) In June 2014, Boshnack and Rothman announced their intention to form a new FCM under the name High Ridge. (SAC ¶ 93.) High Ridge only was permitted to register with the NFA as an Introducing Broker ("IB"), not as an FCM. (*Id*.) In or around August 2014, VFM agreed to transfer its former clearing business to ADM Investor Services, Inc. ("ADMIS"), an FCM registered with the NFA. (SAC ¶ 94.)

On August 28, 2014, ADMIS, through its President, Tom Kadlec, entered into a Guarantee & Fee Agreement ("G&F Agreement") with High Ridge, Boshnack and Rothman, through which

---

[1] For purposes of Defendants' motions to dismiss, the Court accepts Plaintiffs' allegations as true and draws all reasonable inferences in their favor. *See City of Providence v. BATS Glob. Mkts., Inc.*, 878 F.3d 36, 50 (2d Cir. 2017).

[2] An FCM is an individual or organization that solicits and accepts orders to buy or sell futures contracts and accepts money from (or extends credit to) customers in connection with such orders. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 175 (2d Cir. 2013).

[3] The NFA is a private corporation registered as a futures association under the Commodity Exchange Act ("CEA") and functions as a self-regulatory organization for the futures industry under the oversight of the Commodity Futures Trading Commission ("CFTC"). *See Kumaran v. Nat'l Futures Ass'n*, No. 20-CV-03668 (GHW) (SDA), 2021 WL 9080121, at *2 (S.D.N.Y. Sept. 16, 2021) (setting forth relevant background regarding the role of NFA).

ADMIS agreed to provide credit lines for approximately 145 former VFM brokers (the "Vision IBs").[4] (SAC ¶ 95; *see also* G&F Agreement, 20-CV-03668 ECF No. 58-1, § 2.1(c).) The terms of the agreement included that High Ridge, Boshnack and Rothman would provide personal guarantees on all customer accounts opened by the Vision IBs. (SAC ¶ 96.) In exchange, they would receive "trailing fees and commissions" from all transactions placed in those accounts. (*Id*.) The G&F Agreement was not disclosed to customers. (SAC ¶ 18.)

In November 2014, High Ridge, Boshnack, Rothman and Felag entered into an oral risk services agreement ("ORSA") with ADMIS allowing them to access ADMIS's confidential account records, including trade secrets and non-public information, and giving them discretion regarding how risks were managed, including discretionary authority over margin requirements and trading limits. (SAC ¶¶ 103-04, 529.) As with the G&F Agreement, Plaintiffs allege that the ORSA was not disclosed to customers. (SAC ¶ 114.) Plaintiffs allege that the G&F Agreement and the ORSA were part of a scheme to allow Boshnack and Rothman to continue to operate as an "quasi-FCM" under the cover of ADMIS, while at the same time accessing information from ADMIS's customers which they later used to compete against Plaintiffs. (*See, e.g.*, SAC ¶¶ 120-23.)

On or around December 11, 2016, Plaintiff Samantha Siva Kumaran ("Kumaran") spoke to Defendant Villa, who represented herself as an equities broker for Garwood Securities. (SAC ¶ 306.) On December 16, 2016, during a telephone call between Kumaran and Villa about software prices, Villa solicited Kumaran to open a commodity futures account for trading commodities

---

[4] IBs that are parties to binding guarantee agreements, in which an FCM guarantees the performance by the IB of the IB's obligations under the CEA, are not required independently to meet net capital requirements. *See Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 651 (7th Cir. 2013). Thus, a guarantee agreement is "an alternative means for an IB to satisfy the CFTC's standards of financial responsibility." *Id*. (internal quotation marks and alterations omitted).

futures and options through Lazzara (Villa's former employer and a former Vision IB). (SAC ¶ 325.) Villa was compensated for the referral, even though she no longer was registered as an Associated Person ("AP")[5] of LCI.[6] (SAC ¶ 324.) Thereafter, Kumaran spoke with Lazzara about opening an FCM account and told him that she was in the process of registering as a CTA and forming various hedge funds, including a commodities options hedge fund under the name STORM. (SAC ¶ 333, 335-36, 341.) Lazzara referred Kumaran to open a futures account at ADMIS, but did not disclose the G&F Agreement or the ORSA. (SAC ¶¶ 334, 351-56, 371.)

In January 2017, Kumaran, as Managing Member of NRCM, opened an account with ADMIS. (SAC ¶ 430.) At the time, Lazzara represented that the only fees and commissions to the account would be $1.50 in commissions, NFA fees and Exchange fees. (SAC ¶ 431.) Thereafter, Plaintiffs allege that there were errors in risk management, and they were charged unauthorized fees. (SAC ¶¶ 449-50, 479-83, 506, 514.) However, as of April 20, 2017, the account performance was showing higher than average returns. (SAC ¶ 504.) On or around May 2, 2017, additional fees were deducted from the account in an effort to thwart performance and deplete profits. (SAC ¶ 523.) On or around June 25, 2017, Kumaran closed the account at ADMIS. (SAC ¶ 579.) On March 13, 2018, Boshnack and Rothman registered Vision Investment Advisors ("VIA") as a CTA. (SAC ¶ 252.)

---

[5] An AP is an individual who solicits orders, customers or customer funds (or who supervises persons so engaged) on behalf of a FCM, retail foreign exchange dealer, IB, Commodity Trading Advisor ("CTA") or Commodity Pool Operator. *See* NFA Registration and Membership, https://www.nfa.futures.org/registration-membership/index.html (last visited Aug. 2, 2022).

[6] Villa was registered as an AP of LCI from July 11, 2014 until May 18, 2015. (SAC ¶ 318.) Villa again worked for LCI from on or around April 25, 2017 until June 19, 2017 in a customer facing and analyst role. (SAC ¶¶ 328-29.)

In June 2018, NRCM filed an arbitration claim with the NFA alleging multiple violations of the CEA related to "the scheme by ADMIS, [VFM] and numerous Vision IB[s], to defraud customers and CTA[s]." (*See* Arbitration Claim, *In re Nefertiti Risk Capital Management, LLC*, 18-ARB-5 (NFA) ("NFA Arbitration Claim"), ECF No. 102-4.) Among the Respondents named by NRCM in the arbitration claim were LCI, Lazzara, High Ridge, Felag, Rothman and Boshnack. (*See id*. at PDF pp. 2-3.)

**PROCEDURAL HISTORY**

On May 19, 2020, Kumaran filed the Complaint in this action purporting to assert claims on behalf of herself, NRCM and approximately 100 other CTAs and 100 other customers. (Compl., ECF No. 1.) On August 20, 2020, the Court dismissed all claims, except for those brought by Kumaran individually. (8/20/20 Order, ECF No. 13.) On September 30, 2020, Kumaran filed an Amended Complaint. (Am. Compl., ECF No. 20.) On December 22, 2020, counsel appeared on behalf of NRCM (ECF No. 40) and, on January 18, 2021, filed a motion to intervene to add NRCM as a plaintiff in the Amended Complaint. (1/18/21 Motion, ECF No. 41.) Absent objection from Defendants, the Court granted the motion to intervene on January 26, 2021 and directed Kumaran and NRCM to file a second amended complaint adding NRCM as a plaintiff. (1/26/21 Order, ECF No. 44.)

On March 15, 2021, Kumaran filed a purported second amended complaint on behalf of herself and, on March 16, 2021, NRCM and NAM filed a separate amended complaint. (*See* ECF Nos. 48 & 49.) On April 20, 2021, NAM and Nefertiti Holding Corporation ("NHC") filed a motion to intervene. (4/20/21 Motion, ECF No. 60.) On April 30, 2021, the Court struck the amended pleadings filed in March, as they did not comply with the Court's prior Order, and directed

Plaintiffs to file a single, consolidated second amended pleading. (4/30/21 Order, ECF No. 69.) On May 28, 2021, the Court granted on consent the motion by NAM and NHC to intervene. (5/28/21 Order, ECF No. 72; 6/14/21 Am. Order, ECF No. 78.) On July 30, 2021, Plaintiffs filed the 202-page SAC (with 31 exhibits) that is now before the Court. (*See* SAC.)

On September 17, 2021, Villa filed her motion to dismiss and on September 23, 2021 the Vision Defendants filed their motion. (*See* Villa Mot. to Dismiss; Vision Defs.' Mot. to Dismiss.) Plaintiffs sought to bifurcate briefing on the partial motion to compel arbitration, which the Court denied on September 30, 2021. (9/30/2021 Order, ECF No. 109.)  On November 22, 2021, the Court granted Plaintiffs an extension of time to file their opposition briefing until December 14, 2021. (11/22/2021 Order, ECF No. 111.) On December 14, 2021, Plaintiffs filed their opposition memoranda. (NRCM/NAM Opp. Mem., ECF No. 114; Kumaran Vision Opp. Mem., ECF No. 115;[7] Kumaran Villa Opp. Mem., ECF No. 116.) Defendants filed their replies on January 14, 2022. (Vision Defs.' Reply Mem., ECF No. 126; Villa Reply Mem., ECF No. 128.)

## LEGAL STANDARDS

### I.    Motion To Compel Arbitration

"The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*., creates a body of federal substantive law of arbitrability applicable to arbitration agreements . . . affecting interstate commerce." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (internal quotation marks and citation omitted). "Enacted to reverse centuries of judicial hostility to

---

[7] The memorandum filed by NRCM and NAM was in opposition to the motion to compel arbitration. (*See* NRCM/NAM Opp. Mem.) Although Kumaran's 102-page memorandum in opposition to the Vision Defendants' motion to dismiss purports to incorporate portions of NRCM, NAM and NHC's memorandum in opposition to the motion to dismiss (*see, e.g.*, Kumaran Vision Opp. Mem. at PDF p. 5), no such memorandum timely was filed, and the Court denied further briefing. (*See* 1/21/22 Order, ECF No. 129.)

arbitration agreements, the FAA embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]" *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 100 (S.D.N.Y. 2017) (citing *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 119 (2d Cir. 1991); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)) (internal quotation marks and alterations omitted); *see also Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution.") (citation omitted).

Section 2 of the FAA provides, in relevant part, that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements in accordance with § 2 of the FAA." *Sanders v. Forex Cap. Mkts, LLC*, No. 11-CV-00864 (CM), 2011 WL 5980202, at *5 (S.D.N.Y. Nov. 29, 2011) (citing, *inter alia*, *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687 (1996)).

"Where a party to an arbitration agreement refuses to comply with that agreement, and instead attempts to proceed in litigation, the other party may move to stay the litigation and compel arbitration." *McCants v. Team Elec., Inc.*, No. 19-CV-09565 (AJN) (RWL), 2021 WL 653122, at *3 (S.D.N.Y. Feb. 19, 2021) (citing FAA §§ 3, 4). "In deciding whether claims are subject to

arbitration, courts consider: (1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." *Wang v. Guo*, No. 19-CV-02884 (PGG), 2020 WL 4937481, at *5 (S.D.N.Y. Aug. 22, 2020) (internal quotations marks and citations omitted); *see also Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

 "In deciding a motion to compel arbitration, courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179-80 (2d Cir. 2021) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "Courts must consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and must draw all reasonable inferences in favor of the non-moving party." *Id.* at 180 (internal citation, quotation marks and alterations omitted).

"District courts in this Circuit regularly have concluded that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive and therefore within a Magistrate Judge's purview to decide without issuing a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)." *McCants*, 2021 WL 653122, at *1 n.1 (quoting *Chen-Oster v. Goldman Sachs*, 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020) (collecting cases)).

## II.     Motion To Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive

a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible if the complaint contains factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 239 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

In deciding a motion to dismiss, the Court "must accept as true all of the factual allegations contained in a complaint[,]" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted); *see also Nguyen* 364 F. Supp. 3d at 239 ("The Court need not accept as true, 'legal conclusions, deductions, or opinions couched as factual allegations.'") (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Where, as here in the case of Kumaran, a plaintiff is proceeding *pro se*, the Court must "construe [her] complaint liberally and interpret it to raise the strongest arguments that it suggests." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted).

"In considering a motion to dismiss, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010)

(citation omitted). "While the Court must accept the facts as alleged in the complaint, 'when any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true.'" *Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) (quoting *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002)).

Claims of fraud also must satisfy the Federal Rule of Civil Procedure's heightened pleading standard under Rule 9(b). *See Reich v. Lopez*, 38 F. Supp. 3d 436, 445 (S.D.N.Y. 2014) (applying Rule 9(b)'s heightened pleading standard to "all claims of fraud—including those under [the Racketeer Influenced and Corrupt Organizations Act ('RICO')]"). To meet this standard, allegations of fraud must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402-03 (2d Cir. 2015) (citation omitted). "Courts are especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants." *Trahan*, 457 F. Supp. 3d at 342 (internal alterations and citation omitted). "[A] complaint may not rely upon blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the fraud." *Id.* (citation omitted).

## DISCUSSION

### I.    It Is Hereby Ordered That Defendants' Partial Motion To Compel Arbitration Is Granted

The Vision Defendants argue that NRCM and NAM, as NFA members and pursuant to NFA

Bylaw 301,[8] agreed to mandatory arbitration of claims against other NFA members, such that the

claims by NRCM and NAM against High Ridge, Rothman, Boshnack, Felag, LCI, Lazzara and VIA

are subject to NFA arbitration. (Vision Defs.' Mem., ECF No. 102 at 10-12.) The Vision Defendants

also argue that NRCM should be compelled to arbitrate its claims against High Ridge, Rothman,

Boshnack, Felag, LCI and Lazzara for the additional reason that NRCM initiated NFA arbitration

against them and, therefore, waived its right to challenge the arbitration. (*Id*. at 12-13.)

In the related case against ADMIS, the Court previously held that NRCM had to arbitrate

its claims against ADMIS because it initiated arbitration and went on to participate in the

arbitration for over a year and a half before filing a lawsuit in this Court. *Kumaran v. ADM Inv.

Servs., Inc.*, No. 20-CV-03873 (GHW) (SDA), 2021 WL 2333645, at *4-5 (S.D.N.Y. June 7, 2021).[9]

Because NRCM also initiated the arbitration against High Ridge, Rothman, Boshnack, Felag, LCI

and Lazzara, it is hereby Ordered that the motion to compel arbitration is granted as to NRCM's

claims against them for the same reason.[10] With respect to NRCM's claims against VIA, it also is

---

[8] Under NFA Bylaw 301(f), applicants for NFA membership agree that "whenever admitted to NFA membership or registered as an Associate, the applicant and its employees shall become and remain bound by all NFA requirements, including . . . [the] Code of Arbitration and Member Arbitration Rules as then and thereafter in effect." *See* NFA Bylaw 301(f)(ii)(C), available at https://www.nfa.futures.org/rulebook/index.aspx.

[9] Judge Woods subsequently overruled the objections to my June 7, 2021 Order. (*See Kumaran v. ADM Investor Services, Inc.*, No. 20-CV-03873, ECF No. 90.)

[10] Although ADMIS also moved to compel arbitration based on a written arbitration agreement between ADMIS and NRCM, the Court found that "by initiating arbitration against ADMIS, NRCM agreed to arbitrate its claims, regardless of any prior agreement to do so[.]" *Kumaran*, 2021 WL 2333645, at *4. Thus, the fact that there is no similar written agreement to arbitrate in this case does not change the Court's conclusion.

Ordered that the motion to compel arbitration is granted. NRCM was a member of the NFA between May 23, 2017 and July 20, 2020. (SAC ¶ 56.) Although VIA did not become an NFA member until March 13, 2018 (SAC ¶ 86, 252; *see also* BASIC[11]), the allegations in the SAC regarding VIA appear to pertain to its alleged use of Kumaran's trade secrets as a competing CTA after it became an NFA member. (*See, e.g.*, SAC ¶¶ 252-54.) Because NRCM and VIA both were NFA members during the relevant time period, NRCM was required to submit its claims against VIA to NFA arbitration. *See* NFA Bylaw 301(f); *accord Kumaran*, 2021 WL 2333645, at *8.[12]

As for NAM, it did not become an NFA member until September 22, 2020 (SAC ¶ 57) and, thus, was not required to arbitrate any claims prior to that date.[13] *Accord Kumaran*, 2021 WL 2333645, at *6 (NFA Bylaw 301(f) did not require Kumaran to arbitrate individual claims prior to time she became NFA member). However, based upon the record before the Court in this case and one of the related cases, any claims asserted by NAM are as an NFA member. (*See, e.g.*, SAC ¶¶ 693 (alleging harm by competitors), 705 (alleging competition by High Ridge in January 2021); *see also* 2/18/2022 Hr'g Tr., 20-CV-03783 ECF No. 97, at 5-7 (statements by prior counsel for NAM

---

[11] As set forth on the NFA's website, BASIC is a free tool that NFA Members and investors can use to research the background of derivatives industry professionals. *See* National Futures Association, BASIC Search, https://www.nfa.futures.org/BasicNet/ (last visited July 29, 2022). The Court takes judicial notice of the information contained in the BASIC database. According to BASIC, NRCM's NFA membership ended on July 30, 2020.

[12] NRCM and NAM also argue that the motion to compel arbitration should be denied because arbitration at this point would be untimely under the NFA Rules. (*See* NRCM/NAM Opp. Mem. at 5-6.) However, absent an agreement to the contrary, the issue of timeliness of arbitration must be resolved by the arbitrators in the first instance. *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34-35 (2014) ("courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration" including time limits); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) (applicability of time limit rule "presumptively for the arbitrator, not for the judge").

[13] As set forth below, *see* footnote 17, *infra*, NAM cannot assert claims based on conduct that occurred prior to its formation on May 14, 2018. Thus, any claims it has would be from after that date.

that NAM was "essentially nonexistent" prior to NFA registration on September 22, 2020).) Thus, the Court finds that NAM also must arbitrate its claims against High Ridge, Rothman, Boshnack, Felag, LCI, Lazzara and VIA.[14]

For these reasons, it is hereby Ordered that the partial motion to compel arbitration is granted and the claims by NRCM and NAM against High Ridge, Rothman, Boshnack, Felag, LCI, Lazzara and VIA are stayed pending the completion of arbitration.

## II.    It Is Recommended That Defendants' Motion To Dismiss Be Granted In Part[15]

### A.    The Remaining Federal Claims Should Be Dismissed[16]

#### 1.    The Remaining Civil RICO Claims (Counts 1 and 2) Should Be Dismissed

RICO confers a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the statute. 18 U.S.C. § 1964(c). In relevant part,

---

[14] To the extent NRCM and NAM can assert any claims against VIA prior to VIA's membership in the NFA and/or to the extent NAM can assert any claims between the date of its formation and the date it became an NFA member, the Court recommends that those claims be dismissed or that the Court decline to exercise supplemental jurisdiction for the same reasons as the non-arbitrable claims discussed below.

[15] As a threshold matter, Defendants move to dismiss the SAC on the ground that it fails to comply with Rule 8(a). (Vision Defs.' Mem. at 13-17; Villa Mem., ECF No. 99 at 22-23; Vision Defs.' Reply Mem. at 5.) Dismissal under Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Trahan*, 457 F. Supp. 3d at 363 (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)). "[U]nnecessary prolixity in a pleading places an unjustified burden on the court and the [parties] who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin*, 861 F.2d at 42 (citation omitted). That certainly is the case here. Nonetheless, the Court finds that dismissal under Rule 8 is not warranted because the SAC does not "overwhelm the defendants' ability to understand or to mount a defense." *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004); *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) (refusing to dismiss 368-page, 1,249 paragraph complaint even where it was "an undue imposition on all who [were] obliged to read it"). Moreover, while Defendants raise additional arguments for dismissal regarding, *inter alia*, timeliness, standing and corporate veil-piercing, the Court addresses only those arguments that it finds necessary for the disposition of the current motions.

[16] The remaining federal claims addressed in this section include the RICO and DTSA claims by Kumaran and NHC against High Ridge, Rothman, Boshnack, Felag, LCI, Lazzara and VIA and the claims by all Plaintiffs

the Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). "To establish a civil claim under RICO, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." *Lundy v. Catholic Health Sys. of L.I., Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (internal quotation marks and citation omitted). Plaintiffs allege that Defendants formed two criminal enterprises that worked together as part of a widespread, multiyear scheme to steal money and trade secrets for the benefit of High Ridge, HRHC and VIA. (*See, e.g.*, SAC ¶¶ 13, 661-62, 667, 703-05, 719, 723-30, 735-41, 753; Kumaran Vision Opp. Mem. at 83-86.) The Vision Defendants move to dismiss primarily on the ground that Plaintiffs fail to adequately allege a pattern of racketeering activity.[17] (Vision Defs.' Mem. at 21-23.) The Court agrees.

"Racketeering activity" encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include, as relevant here, 18 U.S.C. § 1341 (mail

---

against VFM, VBS, HRHC, Boshnack Family LLC, H. Rothman Family LLC and Villa. For simplicity, the Court refers to allegations by "Plaintiffs," but is not addressing claims by NRCM and NAM that are subject to arbitration.

[17] The Vision Defendants also argue that claims NHC (and any remaining claims by NAM) should be dismissed because they hinge on conduct that occurred prior to their formation. (Vision Defs.' Mem. at 18-19.) NAM is a Delaware LLC that was formed on May 14, 2018. (SAC ¶ 57.) NHC is a New York S Corporation that was formed in or around September 2017. (SAC ¶ 58.) NAM and NHC cannot assert claims based on conduct that occurred prior to their respective formation dates. *See, e.g., Rubenstein v. Mayor*, 41 A.D.3d 826, 828 (2nd Dep't 2007) ("a nonexistent entity cannot acquire rights or assume liabilities"). Although Plaintiffs assert that the RICO claims are ongoing (*see, e.g.*, SAC ¶¶ 724, 748, 756), as set forth herein, the Court finds that they have failed to adequately allege an ongoing scheme. Accordingly, I recommend that the RICO claim by NHC (and any remaining RICO claim by NAM) be dismissed on this basis as well.

fraud), 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1832 (theft of trade secrets). A "'pattern of racketeering activity' requires at least two acts of racketeering activity" committed in a 10-year period. 18 U.S.C. § 1961(5); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). "To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are 'related, and that they amount to or pose a threat of continued criminal activity.'" *Cofacredit*, 187 F.3d at 242 (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The continuity necessary to prove a pattern can be either "closed-ended continuity," or "open-ended continuity." *See id.* (citation omitted). "To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial period of time." *Id.* (citation omitted). "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Id.* (citation omitted) "While [a threat of continuing criminal activity] is 'generally presumed when the enterprise's business is primarily or inherently unlawful,' there is no such presumption for an enterprise which 'primarily conducts a legitimate business.'" *Jus Punjabi, LLC v. Get Punjabi Inc.*, No. 14-CV-03318 (GHW), 2015 WL 2400182, at *10 (S.D.N.Y. May 20, 2015) (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (citation omitted)), *aff'd*, 640 F. App'x 56 (2d Cir. 2016)).[18] Where an "enterprise primarily conducts a legitimate business, there must be some evidence from which

---

[18] In addition, "it is well established law that fraud does not fall within the 'inherently unlawful' category of predicate acts so as to imply a threat of continued criminal activity." *CrossBorder Sols., Inc. v. Macias, Gini, & O'Connell, LLP*, No. 20-CV-04877 (NSR), 2022 WL 562934, at *9 (S.D.N.Y. Feb. 23, 2022) (citing cases).

it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243.

Kumaran argues that she has satisfied the open-ended continuity requirement because she adequately has alleged a threat of continuing criminal activity based on allegations that Defendants have defrauded other customers.[19] (*See* Kumaran Vision Opp. Mem. at 83-84 (citing SAC ¶¶ 6, 12, 663); *see also id.* at 91-92 (citing, *inter alia*, SAC ¶¶ 10, 24, 654, 702, 739, 754-55).) However, Plaintiffs have not adequately alleged facts to support their general assertions that there were "dozens" or even "thousands" of other victims of the alleged scheme. (SAC ¶¶ 6, 12.) Accordingly, I find that they have failed to adequately allege open-ended continuity. *See MAVL Cap., Inc. v. Marine Transp. Logistics, Inc.*, 130 F. Supp. 3d 726, 733 (E.D.N.Y. 2015) (no open-ended continuity when plaintiffs did not plausibly allege existence of any other victims or racketeering scheme); *R.B. Dev. Co.,* 2013 WL 12358006, at *15 (alleging "a long line of victims" too vague to meet requirements of Rule 9(b) and, thus, could not form basis of open-ended continuity) (citing *Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 571-72 (W.D.N.Y. 2011) ("dismissing RICO

---

[19] Kumaran does not appear to argue that she satisfies the closed-ended continuity requirement, and, in any event, the Court finds that it is not met. Closed-ended continuity is "primarily a temporal requirement" that, typically requires conduct spanning at least two years. *See Spool*, 520 F.3d at 184. Here, although Kumaran asserts that the alleged scheme began in 2014 (SAC ¶¶ 663, 719, 744), the alleged predicate activity occurred over a period of fewer than five months (SAC Ex. 14) and, therefore, is insufficient. *See Spool*, 520 F.3d at 184 (relevant period for closed-ended continuity is "time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place") (citation omitted). Nor is there any basis for finding that the conduct at issue here qualifies as one of the "rare" instances of closed-ended continuity for a period significantly shorter than two years. *R.B. Dev. Co., LTD. v. Tutis Cap. LLC*, No. 12-CV-01460 (CBA) (SMG), 2013 WL 12358006, at *14 (E.D.N.Y. Sept. 27, 2013) (conduct involving "a limited number of perpetrators and victims and a limited goal . . . is lacking in closed-ended continuity") (citing cases).

claim where plaintiff sought to establish open-ended continuity by alleging mere existence of similar fraudulent schemes perpetrated by defendants without pleading any particularized facts")). Nor are Plaintiffs' conclusory allegations that mail and wire fraud were Defendants' "regular way of doing business" (*see, e.g.*, SAC ¶ 550) sufficient to allege open-ended continuity. *See AmBase Corp. v. 111 W. 57th Sponsor LLC*, 785 F. App'x 886, 889 (2d Cir. 2019) (conclusory assertions that alleged schemes were defendants' regular way of doing business insufficient to demonstrate open-ended continuity). At best, the allegations in the SAC reveal "only 'a serious, but discrete and relatively short-lived scheme to defraud,' which is insufficient to establish open-ended continuity." *See Spool*, 520 F.3d at 186 (quoting *Cofacredit*, 187 F.3d at 244).

Defendant Villa separately argues that Plaintiffs' claims against her should be dismissed because they have not adequately alleged that Villa participated in the alleged enterprise. (Villa Mem. at 12-13.) In order "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs" under § 1962(c), a defendant "must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). As the Court previously set forth in one of the related cases in a Report and Recommendation that was adopted in relevant part by Judge Woods, "the 'operation and management' test is an extremely rigorous test, and it is not enough to merely take directions and perform tasks that are necessary and helpful to the enterprise nor simply provide goods and services that ultimately benefit the enterprise." *Kumaran v. Nat'l Futures Ass'n*, No. 20-CV-03668 (GHW) (SDA), 2021 WL 9080121, at *14 n.35 (S.D.N.Y. Sept. 16, 2021) (citing *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 441 (S.D.N.Y. 2019)).

Plaintiffs allege that Villa was a "spotter" who roped newcomers into the scheme through the use of fraudulent interstate wire and telephonic communications. (SAC ¶¶ 271-73, 314, 328, 739; *see also* SAC Ex. 15.) For example, Plaintiffs allege that Villa participated in telephone conversations with Kumaran in which she "fraudulently concealed" the alleged scheme and participated in the unauthorized withdrawal of fees from NRCM's account after Villa commenced working for LCI in May 2017. (SAC Ex. 15.) However, Plaintiffs' allegations that Villa was aware of the alleged scheme based on her prior relationship with LCI, or that she "participate[d] directly in the diversion of moneys, property and assets to both herself individually and the Vision Enterprise" are conclusory. (SAC ¶ 314, 318-20, 330-31.) Moreover, Villa's actions in the conduct of her own affairs as an IB cannot establish participation in the enterprise "absent some more express connection with the enterprise's unique purpose[.]" *Choi v. 37 Parsons Realty LLC*, 444 F. Supp. 3d 411, 420 (E.D.N.Y. 2020) (dismissing RICO claim against escrow agent when allegations did not plausibly allege participation in enterprise as distinct from defendant's own affairs). In sum, the allegations against Villa do not permit the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). Accordingly, I recommend that Plaintiffs' RICO claims against Villa be dismissed for these reasons as well.

Finally, because I find that Plaintiffs do not adequately allege a substantive violation of RICO, any allegation of a RICO conspiracy in violation of 18 U.S.C. § 1962(d) (Count 2) also should be dismissed. *See AmBase Corp.*, 785 F. App'x at 889 (citing *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004)).

**2.**     **The Remaining DTSA Claims (Count 3) Should Be Dismissed**

The DTSA provides a federal cause of action for trade secret misappropriation. *See* 18 U.S.C. § 1836(b)). "To state a claim for trade secret misappropriation under the DTSA a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15-CV-00211 (LGS) (SDA), 2020 WL 1442915, at *8 (S.D.N.Y. Jan. 27, 2020) (citation omitted), *report and recommendation adopted*, 2020 WL 1435645 (S.D.N.Y. Mar. 24, 2020).

The Vision Defendants and Villa argue that this claim should be dismissed because Plaintiffs have failed to plausibly allege the existence of a trade secret. (Vision Defs.' Mem. at 23-25; Villa Mem. at 13-14.) In opposition, Kumaran argues that she adequately has pled the existence of two trade secrets: the CTA options trading strategies called STORM, and risk management processes and techniques. (Kumaran Vision Opp. Mem. at 46-54.)

"The DTSA defines 'trade secret' to include 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,' so long as: (1) 'the owner thereof has taken reasonable measures to keep such information secret'; and (2) 'the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Trahan*, 457 F. Supp. 3d at 342 (citation omitted) (quoting 18 U.S.C. § 1839(3)). Although the Second Circuit has not "expressly required trade secrets to be identified with any particular degree of specificity, it is evident that a 'vague and indefinite' piece of

information cannot be protected as a trade secret." *Zabit v. Brandometry*, LLC, 540 F. Supp. 3d 412, 422 (S.D.N.Y. 2021) (quoting *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 515 (S.D.N.Y. 2017)).

Plaintiffs allege that Kumaran developed "a set of options trading and risk management strategies" under the name STORM and that "STORM and its trading algorithms, risk management strategies, and details of the trades and transaction records that reveal the trading and risk strategies are the valuable trade secrets owned by Kumaran." (SAC ¶ 61; *see also* SAC ¶ 69.) Plaintiffs further allege that "[s]pecific components that provide the trade secrets of the trading strategy, are the type of option strategy, combination of options trades placed, volumes, strikes, premiums, delta, gamma, vega, and times to expiration, and the combination and integration of the foregoing" as well as "the timing and execution of the trades as well as the risk management strategies to mitigate risk." (SAC ¶ 64 (emphasis omitted).) Plaintiffs also describe these trading and risk management strategies as "quantitative short-term commodity options trading strategies (for S&P, Gold and Crude) that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage." (SAC ¶ 82.)

The Court finds these allegations too general to plausibly allege the existence of a trade secret. With respect to STORM, the SAC states that STORM is not a program "in the literal sense, such as a software program, but the name of a trading strategy." (SAC ¶ 68.) In addition, although the SAC frequently refers to formulae or algorithms and references information that was "built" and required passwords to access (SAC ¶¶ 71-72, 75, 335, 785, 787), Plaintiffs do not identify any

computer program or written set of instructions[20] or other tangible manifestation of the trading strategies that was misappropriated. Instead, Plaintiffs appear to allege that the trading strategies could be discerned from transaction records of NRCM's trades. (SAC ¶¶ 63, 66.) However, nowhere does the SAC describe the trade secret information that allegedly could be discerned from those documents with "sufficient specificity to inform the defendants of what they are alleged to have misappropriated[.]" *Zabit*, 540 F.Supp.3d at 422 (citation omitted). Plaintiffs' allegations of "components that provide the trade secrets" (SAC ¶ 64) are insufficient because they refer only to general categories of information that could apply to any commodities futures trading strategy.[21] *See TRB Acquisitions LLC v. Yedid*, No. 20-CV-00552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021) ("Naturally a DTSA plaintiff has no obligation to reveal its secrets in the complaint simply to prove that they exist . . . that does not mean a party can get away with nebulous descriptions at the highest level of generality.") (cleaned up) (internal quotation marks, citations and alterations omitted); *see also Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-05540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018) ("[a]lleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue . . . does not give rise to a plausible allegation of a trade secret's existence.") (internal quotation marks and citation omitted)). Plaintiffs' allegations regarding risk management processes are even less developed and include only general references to a "risk

---

[20] *See, e.g., ElmagiN Cap., LLC v. Chen*, 555 F. Supp. 3d 170, 175 (E.D. Pa. 2021) (noting that algorithm is a term that typically refers to precise set of instructions expressed in words or code).

[21] For example, "[g]amma is a calculation for options trading, widely employed by options traders to help assess risk in a portfolio." *In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, No. 20-CV-10028 (KPF), 2021 WL 4481215, at *26 n.40 (S.D.N.Y. Sept. 30, 2021).

software analytical tool." (SAC ¶ 78.) For these reasons, I find that Plaintiffs have not sufficiently identified the trade secrets that they allege were misappropriated.

The Vision Defendants further argue that Plaintiffs have not plausibly alleged misappropriation. (Vision Defs.' Mem. at 23-26.) "The DTSA defines 'misappropriation' to include 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means' or 'disclosure or use of a trade secret of another without express or implied consent' in specified circumstances." *AUA Priv. Equity Partners, LLC v. Soto*, No. 17-CV-08035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (quoting 18 U.S.C. § 1839(5)). The term "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[]" but expressly excludes "reverse engineering" and "independent derivation." 18 U.S.C. § 1839(6)(A)-(B).

The Vision Defendants contend that Plaintiffs fail to put forward plausible allegations that any Defendant acquired any information about NRCM's accounts improperly, arguing that Kumaran consented to ADMIS outsourcing certain risk monitoring to third parties. (Vision Defs.' Mem. at 25 (citing ADMIS Privacy Policy); *see also* ADMIS Privacy Policy, ECF No. 102-1).) Although the proper interpretation of the ADMIS Privacy Policy is not an issue to be decided on a motion to dismiss, the Court nonetheless finds that Plaintiffs do not plausibly allege misappropriation based on acquisition because the SAC includes only vague assertions that Defendants "improperly acquired" the trade secrets (*see, e.g.*, SAC ¶¶ 164, 170-75) and does not contain facts regarding the alleged acquisitions or plausibly allege that any Defendant knew or had reason to know that the trade secrets were acquired by improper means.

The Vision Defendants also contend that Plaintiffs cannot plead misappropriation based on Plaintiffs' allegations that Rothman, Boshnack and others used their trade secrets to develop a competing trading program, called SSP, because reverse engineering does not constitute misappropriation under DTSA. (Vision Defs.' Mem. at 26.) Although Plaintiffs may be able to allege misappropriation based on use that is not based on reverse engineering, depending on the particular trade secret, the Court finds the current allegations that SSP is "substantially similar" are insufficient. (SAC ¶ 253; *see also* SAC ¶ 619.)

Kumaran argues that Lazzara and LCI disclosed Plaintiffs' trade secrets to High Ridge and Villa. (Kumaran Vision Opp. Mem. at 55 (citing SAC ¶¶ 408, 436-37, 448, 508, 518).) Disclosure is a separate theory of liability under DTSA that is distinct from acquisition or use. *See Kumaran v. Nat'l Futures Ass'n, LLC*, No. 20-CV-03668 (GHW), 2022 WL 1805936, at *5 (S.D.N.Y. June 2, 2022) ("The DTSA . . . contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use.") (internal quotation marks and citation omitted). NHC, however, cannot state a claim for misappropriation against Lazzara or LCI on this basis since any such disclosure would have occurred while NRCM's account was open, which was prior to NHC's formation. *See* footnote 17*, supra.* And even if these allegations are sufficient for Kumaran to plausibly allege disclosure against Lazzara and LCI, her DTSA claim against them still should be dismissed for failure to adequately allege a trade secret, as set forth above.

III. **The Court Should Decline To Exercise Supplemental Jurisdiction Over The Remaining State Law Claims**

Because I recommend that the remaining federal claims be dismissed, I recommend that the Court decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (district court "may decline to exercise supplemental jurisdiction over a

claim" if "the district court has dismissed all claims over which it has original jurisdiction[.]");
*accord Kumaran*, 2022 WL 1805936, at *8 (declining to exercise supplemental jurisdiction).

## IV.    In The Alternative, Any Remaining Claims Should Be Stayed Pending Arbitration

"[D]istrict courts . . . may stay a case pursuant to the power inherent in every court to
control the disposition of the causes on its docket with economy of time and effort for itself, for
counsel, and for litigants." *Katsoris*, 237 F. Supp. 3d at 110 (quoting *WorldCrisa v. Armstrong*, 129
F.3d 71, 76 (2d Cir. 1997)). "The Court must consider factors such as the desirability of avoiding
piecemeal litigation and the degree to which the cases necessitate duplication of discovery or
issue resolution." *Id*. (citation omitted). "A discretionary stay is particularly appropriate where
there is significant factual overlap between the remaining claims and the arbitrated claims*." Id.*
at 110-11 (citing, *inter alia*, *Moore v. Interacciones Glob., Inc.*, No. 94-CV-04789 (RWS), 1995 WL
33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when
they involve common issues of fact and law with those subject to arbitration or when the
arbitration is likely to dispose of issues common to claims against both arbitrating and non-
arbitrating defendants.")). "In such cases, a stay is warranted in part because the prior litigation
or arbitration is likely to have preclusive effect over some or all of the claims not subject to
arbitration." *Id*. at 111.

As set forth above, the Court recommends dismissal of the non-arbitrable federal claims
and that the Court decline to exercise jurisdiction over the remaining state law claims. In the
alternative, given the significant factual overlap between the claims in this action, the non-
arbitrable claims should be stayed pending the completion of arbitration. *Accord Kumaran*, 2021

WL 2333645, at *6 (staying Kumaran's individual claims pending completion of arbitration) (citing cases).

## V.    __Leave To Amend__

"In this circuit, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" *Leneau v. Ponte*, No. 16-CV-00776 (GHW), 2018 WL 566456, at *18 (S.D.N.Y. Jan. 25, 2018) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). "However, '[r]easons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party.'" *Moniodes v. Autonomy Capital (Jersey) LP*, No. 20-CV-05648 (GHW), 2021 WL 3605385, at *8 (S.D.N.Y. Aug. 11, 2021) (quoting *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). Accordingly, if the Court adopts my recommendation to dismiss the non-arbitrable RICO and DTSA claims, I further recommend that Plaintiffs be granted leave to amend. *Accord* Kumaran, 2022 WL 1805936, at *8 (granting leave to amend claims against Kadlec).

However, for the same reasons set forth in Discussion Section IV, *supra*, I recommend that the filing of any further amended pleading be stayed pending the completion of arbitration. *Accord Byrne v. Charter Commc'ns, Inc.*, No. 20-CV-00712 (CSH), 2022 WL 138020, at *10 (D. Conn. Jan. 14, 2022) (exercising discretion to stay action by one plaintiff pending completion of arbitration of claims by co-plaintiffs).

## __CONCLUSION__

For the foregoing reasons, it is hereby Ordered that the partial motion to compel arbitration is GRANTED and this action is STAYED with respect to the claims by NRCM and NAM against defendants High Ridge, Rothman, Boshnack, Felag, LCI, Lazzara and VIA. In addition, I

respectfully recommend that the motions to dismiss be GRANTED IN PART and DENIED IN PART, such that the Court dismiss the non-arbitrable federal claims and decline to exercise supplemental jurisdiction over the non-arbitrable state law claims.

In the alternative, the remaining claims should be stayed pending the completion of arbitration. I further recommend that Plaintiffs be granted leave to amend the non-arbitrable claims, but that the filing of any amended pleading be stayed pending the completion of arbitration.

**SO ORDERED.**

Dated:      New York, New York
            August 4, 2022

_____
STEWART D. AARON
United States Magistrate Judge

\*              \*              \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION
CONTAINED HEREIN**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Opinion and Order and Report and Recommendation to file written objections to those portions of that contain recommendations, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods.

**THE FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).